IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| | ) | |
| | ) | |
| FIDELITY BROKERAGE SERVICES LLC, | ) | Civil Action No.: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MELISSA CLEMENS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF FIDELITY'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................2

    A.  Fidelity's Unique Business Model, and Its Protection of Trade Secret
       Customer Information ....................................................................................2

    B.  Clemens Agreed To Preserve the Confidentiality of Fidelity's Trade Secret
       Customer Information and Not To Solicit Fidelity Customers ......................5

    C.  Clemens Misappropriated Fidelity's Trade Secret Customer Data and Is Using
       It and Fidelity's Customer Goodwill for the Benefit of A Competitor .......6

ARGUMENT ...............................................................................................................10

I.    Applicable Legal Standard ................................................................................10

II.   Fidelity Is Likely To Succeed On The Merits. ................................................11

    A.  Fidelity Is Likely to Succeed on its Claim for Breach of Contract. ...........11

        1.  Applicable Law ...............................................................................11

        2.  The Employee Agreement Is Enforceable, and Clemens Breached Her
           Obligations Thereunder ..................................................................14

        3.  Injunctive Relief Is Particularly Warranted Under the Circumstances ................18

    B.  Fidelity Is Likely to Succeed on the Merits of Its Claim for Misappropriation of
       Trade Secrets. ..............................................................................................19

III.  An Injunction Will Save Fidelity From Continued Irreparable Harm. .............23

IV.  An Injunction Will Not Harm Others, And The Public Interest Supports Injunctive
    Relief. ..............................................................................................................24

V.   Injunctive Relief Is Required Before Fidelity Can Obtain An Expedited Arbitration
    On The Merits Before FINRA. ........................................................................20

CONCLUSION ............................................................................................................20

## INTRODUCTION

Comes your Plaintiff, Fidelity Brokerage Services LLC ("Fidelity"), by and through counsel and pursuant to Rule 65 of the Federal Rules of Civil Procedure, submits this Memorandum of Law in Support of its Motion for Temporary Restraining Order and Injunctive Relief. Fidelity seeks a TRO and, at a later date, a preliminary injunction against its former Account Executive, Defendant Melissa Clemens ("Clemens") prohibiting Clemens from unfairly competing with Fidelity by soliciting Fidelity customers in violation of her contractual obligations and using Fidelity's trade secret customer information gained through her employment at Fidelity in violation of both her contractual obligations and Tennessee trade secrets laws.

When Clemens was Fidelity's employee, Fidelity gave her access to relationships with, and access to confidential financial information for, at least 424 households, representing in excess of $466 million in assets under Fidelity management. These customers accounted for approximately *half* of the total assets under management of all of Fidelity's Premium Services customers at Fidelity's Johnson City investor center. Clemens' employee agreement with Fidelity forbids her from using Fidelity's trade secret customer information and from soliciting Fidelity customers.

On September 6, 2013, Clemens abruptly resigned without any advance notice and immediately joined Fidelity's competitor, Wells Fargo Advisors LLC ("Wells Fargo"), in a similar role. When Clemens resigned, Fidelity reminded her of her legal and contractual obligations to Fidelity. Despite those obligations, Clemens has taken trade secret customer information belonging to Fidelity and has been using that information, together with Fidelity's goodwill with those customers, to unlawfully contact and solicit Fidelity customers to transfer the management of their accounts to Clemens at her new firm. Accordingly, Fidelity has been

1

forced to initiate this lawsuit and ask for the Court's intervention. The relief Fidelity seeks is narrow and will not impact Clemens' ability to fairly compete with Fidelity.

At the same time Fidelity filed its Complaint and this Motion, Fidelity also filed a Statement of Claim with the Financial Industry Regulatory Authority ("FINRA") seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2). Although the merits of this case will be resolved in arbitration before FINRA, under FINRA Rule 13804 (attached hereto as Exhibit A), Fidelity is required to seek and obtain an injunction order in court before an expedited FINRA arbitration is permitted to proceed. In the event this Court issues an injunction order, FINRA will schedule an expedited arbitration to take place within 15 days of the entry of the injunction. If no injunctive relief is issued, however, FINRA will assign this case to a standard-track arbitration, which would delay a hearing on the merits for a year or more, leaving Clemens free to continue using Fidelity's trade secrets, confidential information, and goodwill to solicit Fidelity's customers in violation of her employee agreement, as well as Tennessee law. An injunction is therefore required to preserve the status quo for the very short period during which an expedited arbitration hearing before FINRA will take place.

## FACTUAL BACKGROUND

### A. Fidelity's Unique Business Model, and Its Protection of Trade Secret Customer Information

Fidelity is one of the premier retail brokerage businesses in the investment industry; it provides a variety of financial services to its customers, with whom it typically enjoys significant, long-term relationships. (Declaration of David Cvercko ("Cvercko Decl.") ¶ 2.) Fidelity is unique in the retail brokerage field because it does not have its Account Executives ("AEs") make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity. (*Id*. ¶ 3.) Instead, Fidelity requires its AEs to develop service relationships

2

based upon leads that Fidelity provides. (*Id.*) Fidelity provides leads to its AEs from (a) prospective customers who initiate contact with Fidelity, and (b) current Fidelity customers who experience triggering events, such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services, or current Fidelity customers previously serviced by other representatives when, for example, the former representative moves, leaves Fidelity, or is promoted to another position. (*Id.* ¶¶ 4-5.) As a consequence, a large portion of Fidelity's business is derived from this initial customer contact by Fidelity and from thereafter servicing the needs of Fidelity's customers. (*Id.*) AEs are the face of Fidelity for that purpose, responsible for developing and sustaining the customer relationships for assigned customers. (*Id.* ¶ 5.)

Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses by, among other means, national and local advertisements, an interactive internet page, multiple call centers, and prominent retail locations. (*Id.* ¶ 4.) Fidelity's lead-based approach to supporting its AEs with significant investments of time, labor, and capital distinguishes it from other full-service brokerages, where individual brokers, rather than the firm, are responsible for establishing customer relationships. (*Id.* ¶¶ 4-5.)

Fidelity's success in its lead-based approach has resulted in the typically long-standing relationships that Fidelity enjoys with its customers and is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets. (*Id.* ¶¶ 5-6.) Fidelity's trade secret customer data includes the names of and contact information for Fidelity customers, and includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth. (*Id.*) Although certain information might be publicly available – such as an individual's name or published home telephone numbers – only a limited number of Fidelity employees know who among the

3

general public are Fidelity customers, and therefore have a specific need for investment services. (*Id.*) As described above, Fidelity developed its customer data through a significant investment of time, labor, and capital. (*Id.*).

Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information in confidence. (*Id.* ¶ 7) Fidelity derives substantial economic value from preserving its customer data as a trade secret. (*Id.*) Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to Fidelity's trade secret customer data. (*Id.*) In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors. (*Id.*)

Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. (*Id.* ¶ 8.) Fidelity maintains its trade secret customer data on password-protected computers; only employees whose jobs require access to the customer data are provided with such access. (*Id.*) Fidelity maintains a Confidentiality Policy, educates its employees on the policy, and requires employees – including Clemens – to sign employee agreements not to use or disclose Fidelity's confidential information outside of Fidelity. (*Id.*; Declaration of Jonathan Bell ("Bell Decl.") ¶ 8.)

### B. Clemens Agreed To Preserve the Confidentiality of Fidelity's Trade Secret Customer Information and Not To Solicit Fidelity Customers

Defendant Melissa Clemens was employed by Fidelity as an AE in Fidelity's Johnson City, Tennessee, investor center. (Bell Decl. ¶ 4.) To perform in that role, Clemens was

assigned a list of high net worth customers in Fidelity's Premium Service group ("PS"),[1] and given access to their personal and financial information, including names, contact details, investment history and objectives, and other personal information. (*Id*. ¶ 6; Cvercko Decl. ¶ 6.) Specifically, Clemens developed relationships with, and had access to contact and confidential financial information for, at least 424 households, representing in excess of $466 million in assets under Fidelity management. (Bell Decl. ¶¶ 6, 10.) These customers account for approximately half of the total assets under management of all of the Premium Services customers at Fidelity's Johnson City investor center. (*Id.* ¶ 6.)

On April 13, 2001, in connection with the inception of her employment, and again on July 30, 2010, Clemens signed an employee agreement as a condition of her employment with Fidelity. (Bell Decl. ¶ 8 & Exs. B and C attached thereto.) As consideration for Clemens' employee agreements, Fidelity hired and continued to employ her, compensated her throughout her employment, and provided her with introductory and continuing on-the-job training. (Bell Decl. ¶ 9.) Fidelity also assigned Clemens a customer list of high net worth PS customers to service on behalf of Fidelity, and provided her with the trade secret customer information necessary to succeed at Fidelity. (*Id*.) In addition, Fidelity provided Clemens with sales assistance, research, the benefit of Fidelity goodwill and name recognition, and with promotional marketing support. (*Id*.)

Under the terms of her 2010 employee agreement (the "Employee Agreement"), Clemens:

    (a)    Acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information;

---

[1] The majority of PS households have a minimum of $250,000 in invested assets at Fidelity and are high net worth individuals. (Bell Decl. ¶ 5.)

<div style="margin-left: 2em;">

(b)      Promised to use Fidelity's trade secret customer information only in the course of her employment with Fidelity and promised not to divulge Fidelity's trade secret customer information to third parties;

(c)      Promised to return any Fidelity trade secret customer information in her possession to Fidelity upon termination of her employment; and

(d)      Promised not to solicit Fidelity customers for one year after the termination of her employment with Fidelity.

</div>

(*Id*. at Ex. C, ¶¶ 1, 3, 6.)

In her role as AE, Clemens used Fidelity's resources, research, information and back office support to advise Fidelity's customers. (*Id.* ¶ 10.) On Fidelity's behalf, she had repeated, regular communications with customers, typically once per month. (*Id.*) As such, Clemens became the face of Fidelity to the customers and, because of the nature of the interaction, became Fidelity's direct link to the customers. (*Id.*) Starting in the first full calendar year after signing the 2010 Employee Agreement, Fidelity paid Clemens $████████ in 2011, $████████ in 2012, and $████████ through her last day of employment. (*Id.* ¶ 9.)

### C.    Clemens Misappropriated Fidelity's Trade Secret Customer Data and Is Using It and Fidelity's Customer Goodwill for the Benefit of A Competitor

On September 6, 2013, Clemens abruptly resigned without any advance notice. (Bell Decl. ¶ 11.) Upon information and belief, Clemens immediately joined Wells Fargo in a similar role, as a Vice President. (Declaration of Anthony Tevis ("Tevis Decl.") ¶¶ 3-4; Bell Decl. ¶ 4. & Ex. D.) Wells Fargo competes with Fidelity in the retail brokerage industry. (Bell Decl. ¶ 4.) When Clemens resigned, her Fidelity Branch Office Manager specifically reminded her of her legal and contractual obligations to Fidelity. (Bell Decl. ¶ 11.) Despite her contractual obligations and her obligations under Tennessee and federal laws, Fidelity has learned through a wide variety of increasingly troubling customer reports that Clemens has taken Fidelity's trade secret customer information and has been using that information, together with Fidelity's

<div style="text-align: center;">6</div>

goodwill with those customers, to unlawfully contact and solicit Fidelity customers to transfer the management of their accounts to Clemens at her new firm. (Bell Decl. ¶ 12.)

Clemens' misconduct started before she resigned from Fidelity. In that regard, immediately before Clemens resigned from Fidelity, she engaged in suspicious activity on Fidelity's computerized customer management system. (*Id.* ¶¶ 19-20.) Specifically, Clemens accessed the records of seven customers on her last day at Fidelity. (*Id.* ¶ 20.) Each customer record contains extensive personal and confidential information, including address, telephone number, social security number, account numbers, and assets under management. (*Id.* ¶ 19.) Fidelity requires that if a representative like Clemens has an interaction with a customer, the representative is required to enter information concerning that interaction into Fidelity's customer management system. (*Id.*) Clemens noted such an interaction on only one of the seven customers she accessed on her last day with Fidelity. (*Id.* ¶ 20.) Upon information and belief, Clemens was accessing records of Fidelity's customers on her last day for the sole purpose of obtaining confidential customer information to take with her when she left Fidelity. (*Id.*)

According to notes entered by Clemens into Fidelity's customer management system, immediately before she tendered her resignation, she placed a call to a customer named S█████ G████ who is responsible for Fidelity's relationship with E██████████████ which has approximately $5 billion in assets managed with Fidelity. (*Id.* ¶ 21.) Clemens noted that she had offered Mr. G█████ an appointment. (*Id.*)

On the day of Clemens' resignation, Fidelity learned that she planned to solicit Fidelity's customers, with the goal of taking approximately 20 such customers away from Fidelity. Specifically, the same day that Clemens left Fidelity, Anthony Tevis, who is a Private Client Specialist in Fidelity's Johnson City, Tennessee investor center, spoke with Clemens' husband,

<center>7</center>

who stated that Clemens was hoping to take a "handful" of the customers she worked with while at Fidelity and that "she would be fine" if she were able to take approximately 20 customers. (Tevis Decl. ¶¶ 2-4.) Mr. Clemens further informed Mr. Tevis that Wells Fargo's attorneys looked at the Employee Agreement and told Clemens that it was not enforceable, and that since she had resigned under the "Protocol," Clemens could contact anyone she wanted to who had a public telephone number. (*Id.* ¶ 5.) Upon information and belief, the "Protocol" that Mr. Clemens was referring to is the so-called "Protocol for Broker Recruiting," which is an agreement among certain financial institutions governing the movement of brokers among those institutions. (Cvercko Decl. ¶ 9.) However, since Fidelity is not a signatory to the Protocol, it is wholly inapplicable to Fidelity, as well as Clemens' relationship with, resignation from, and obligations to, Fidelity. (*Id.*)

Shortly after Clemens began working for Wells Fargo, and consistent with her above-referenced plan to solicit Fidelity's customers, Fidelity began to receive reports that she was contacting Fidelity customers to solicit their business. (Bell Decl. ¶ 12.) Thereafter, Fidelity conducted an investigation and concluded that Clemens has been using Fidelity customer information and goodwill, which she acquired while employed at Fidelity, to solicit Fidelity customers on behalf of a Fidelity competitor. (*Id.*)

Specifically, Fidelity has received the following reports regarding Clemens' wrongful contact and solicitation:

    a.    On Monday, September 9, 2013, Clemens called Fidelity with customer E█ G█████ on the phone with her. G█████ wanted to liquidate both of her accounts (totaling more than $600,000) and transfer them to Wells Fargo. (*Id.* ¶ 17.)

b.      On Monday, September 9, 2013, customer S███ G█████ reported that Clemens had called him at home on Saturday, September 7, 2013.  (*Id.* ¶ 14.)

c.      On Monday, September 9, 2013, customer H███ H███████ reported that Clemens had called him on Saturday, September 7, 2013.  (*Id.* ¶ 15.)

d.      On Monday, September 9, 2013, an unknown customer called Fidelity and spoke with an AE who has taken over most of the customers to whom Clemens was assigned. (*Id.* ¶ 13.)  The caller indicated that he was a Fidelity customer, and asked for Clemens' cell phone number.  (*Id.*)  He said that Clemens had called him over the weekend and they had scheduled a meeting for 9:00 a.m. that morning.  (*Id.*)

e.      On September 13, 2013, Clemens called Fidelity with customers H███ and B███ C█████ on the phone with her.  (*Id.* ¶ 18.)  The C█████ wanted to liquidate their account and transfer their assets to Wells Fargo.  (*Id.*)  The C█████ had more than $990,000 invested with Fidelity.  (*Id.*)

Based on the customer reports set forth above, information provided from Clemens' own husband, and the accompanying Declarations, Fidelity reasonably believes that Clemens has in her possession Fidelity's information, which is confidential and constitutes a trade secret under applicable law, and that Clemens continues to improperly use that information to solicit Fidelity customers.  (*Id.* ¶ 22.)  Moreover, given Clemens' extensive interaction with Fidelity's customers in her role as AE, she is able to influence the decisions of those customers, which poses a serious risk to Fidelity's retention of their business now that she has departed.  (*Id.* ¶ 10.)

Fidelity has been and continues to be irreparably damaged by the actual and threatened loss of customer goodwill and the loss of revenue caused by Clemens' misappropriation and use of Fidelity's trade secret customer information and her solicitation of Fidelity's customers in

violation of her Employee Agreement.  (*Id.* ¶ 23.)  Fidelity's customers have an expectation that their confidential contact and financial information will be protected and not misused by departing employees.  (*Id.*)  Accordingly, Fidelity asks for the Court's assistance in protecting that information and stopping Clemens' knowing and intentional wrongful conduct.

## ARGUMENT[2]

Fidelity will be irreparably harmed if its goodwill and trade secret customer information are not protected.  The only meaningful way to protect Fidelity is to prevent Clemens, through injunctive relief, from enjoying the fruits of her intentionally wrongful conduct.

## I. APPLICABLE LEGAL STANDARD

In determining whether to issue a preliminary injunction, the Court must weigh the following factors:  "(1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served."  *Partylite Gifts, Inc. v. Swiss Colony Occasions*, 2006 WL 2370338, *2 (E.D. Tenn. Aug. 15, 2006) (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995)).

As the Sixth Circuit has explained, these four factors "are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief."  *Performance Unlimited*, 52 F.3d at 1381 (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).  "'While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision.'"  *NACCO Materials Handling Group, Inc. v. Toyota Materials Handling USA, Inc.*, 366 F. Supp.2d 597, 605 (W.D. Tenn. 2004) *aff'd*, 246 F. App'x 929 (6th Cir. 2007) (citation omitted).

---

[2] Fidelity will separately file an appendix of unpublished authorities.  However, as the *Fidelity Brokerage Services LLC v. Wilder*, No. 11-3729 (Mass. Super. Oct. 25, 2011) decision is cited frequently in this Memorandum, it is also attached to this Memorandum as Exhibit B for ease of reference.

10

As demonstrated below, Fidelity has amply satisfied its burden of proof, and is therefore entitled to the requested injunctive relief.

## II. FIDELITY IS LIKELY TO SUCCEED ON THE MERITS[3]

The Sixth Circuit has made clear that "the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d at 1229. This is because "[t]he showing necessary to establish a likelihood of success on the merits varies inversely with the other three factors." *Partylite*, 2006 WL 2370338 at *3. To establish the likelihood of success on the merits, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits which are so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Partylite*, 2006 WL 2370338 at *3; *Corporate Exp. Prods., Inc. v. Warren*, 2002 WL 1901902, *7 (W.D. Tenn. May 24, 2002) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981)).

### A. Fidelity Is Likely to Succeed on its Claim for Breach of Contract

#### 1. Applicable Law

"For claims based on a contract, Tennessee follows the rule of *lex loci contractus,* meaning it presumes that the claims are governed by the jurisdiction in which it was executed absent a contrary intent." *Town of Smyrna, Tenn. v. Mun. Gas Auth. of Georgia*, 723 F.3d 640, 645 (6th Cir. 2013) (quoting *Vantage Tech., LLC v. Cross,* 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999)). Generally, if the parties intend to apply the laws of another jurisdiction, Tennessee courts will defer to that agreement provided that "the provision was executed in good faith, there is a material connection between the law and the transaction, and the chosen law is not contrary

---

[3] Although Fidelity has stated its complaint in three counts, only the claims for breach of contract and misappropriation of trade secrets are discussed herein, as a showing of likelihood of success on the merits of only one claim is all that is required.

11

to the fundamental policies of Tennessee." *Id.* at 645-46. Here, the parties have expressly

agreed that Massachusetts law will govern (Bell Decl., Exh. C ¶ 10), the provision was executed

in good faith with ample time for Clemens to review and consider it, there is a material

connection to Massachusetts law insofar as Fidelity is headquartered in Massachusetts, and, as

demonstrated below, both Massachusetts and Tennessee share similar policies concerning their

approach to restrictive covenants.

      In both Massachusetts and Tennessee, reasonable restrictive covenants – *i.e.*, those that

are reasonably limited in duration and geographic reach to the extent necessary to protect a

legitimate business interest – will be enforced. *See, e.g., Vantage Tech.*, 17 S.W.3d at 644;

*Federated Mut. Implement & Hardware Ins. Co. v. Anderson*, 49 Tenn. App. 124, 132, 351

S.W.2d 411, 415 (Tenn. Ct. App. 1961) ("Contracts to protect an employer by restriction of

subsequent employment of the employee within reasonable lengths of time and space are

permitted and sanctioned and equity will enjoin an employee from competing in violation of the

restrictive provisions . . . ."); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778, 308 N.E.2d 481,

485 (1974) (cited in *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn. 1984)).

      In Tennessee, the "factors that are relevant in determining whether a covenant...is

reasonable include 'the consideration supporting the agreements; the threatened danger to the

employer in the absence of such an agreement[4]; the economic hardship imposed on the employee

by such a covenant; and (4) whether or not such a covenant should be inimical to public

interest.'" *Vantage Tech.*, 17 S.W.3d at 644. In addition, "the time and territorial limits

involved must be no greater than necessary to protect the business interests of the employer."

*Vantage Tech.*, 17 S.W.3d at 647. The Massachusetts test is substantially the same; courts

---

[4] The "danger to the employer" turns on "whether the employer has a legitimate business interest for the
protection of which a restrictive covenant is reasonable." *Hasty*, 671 S.W.2d at 472-73.

"consider if the covenant (1) is necessary to protect the legitimate business interests of the employer, (2) is supported by consideration, (3) is reasonably limited in all circumstances, including time and space, and (4) is otherwise consonant with public policy."[5] *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999); *see Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 638, 815 N.E.2d 572, 576-77 (2004).

In addition, both states recognize a company's trade secrets, other confidential information, and goodwill (*i.e.*, where "customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer") as legitimate business interests that may be protected through restrictive covenant agreements of the type at issue in this case. *See, e.g.*, *Hasty*, 671 S.W.2d at 473; *Vantage Tech.*, 17 S.W.3d at 645-46; *All Stainless*, 364 Mass. at 778-79 (cited in *Hasty*, 671 S.W.2d at 473); *Kroeger v. Stop & Shop Cos., Inc.*, 13 Mass. App. Ct. 310, 316, 432 N.E.2d 566, 570 (Mass. App. 1982); *Cereva Networks, Inc. v. Lieto*, 2001 WL 1228040, *5 (Mass. Super. Oct. 12, 2001); *Corporate Technologies, Inc. v. Harnett*, 2013 WL 1891308, *3 (D. Mass. May 3, 2013); *Stone Legal Res. Grp., Inc. v. Glebus*, 2003 WL 914994, *3-4 (Mass. Super. Dec. 16, 2002).

### 2. The Employee Agreement Is Enforceable, and Clemens Breached Her Obligations Thereunder

The Employee Agreement is supported by, among other things, Clemens' continued employment at a high level of compensation for over three years before her voluntary departure. *See, e.g.*, *Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp.2d 217, 231-32 (D. Mass. 2011).

---

[5] Impact on the defendant is considered as part of the preliminary injunction standard. *See Gen. Acc. Ins. Co. of Am. v. Bank of New England-W., N.A.*, 403 Mass. 473, 475-76, 531 N.E.2d 252, 254 (1988). Further, in both Tennessee and Massachusetts, courts "may modify an unreasonable covenant [to make] it reasonable." *Vantage Tech.*, 17 S.W.3d at 647; *see Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 37 (Tenn.1984); *Cheney v. Automatic Sprinkler Corp. of Am.*, 377 Mass. 141, 147, 385 N.E.2d 961, 965 (1979); *Kroeger v. Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 312, 432 N.E.2d 566, 568 (1982).

13

The Employee Agreement is also reasonable in duration and territorial limits insofar as it lasts for only one year and its geographic reach is curtailed to the extent that the restriction is directly tied to the customers with whom Clemens worked or about whom she had confidential information. *See Hamilton-Ryker Grp., LLC v. Keymon*, 2010 WL 323057, *12 (Tenn. Ct. App. Jan. 28, 2010) ("[A] restriction against soliciting the employer's customers can in effect substitute for a geographic limitation, by stating the impermissible actions of the employee by other means."); *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 745-46 (Tenn. Ct. App. 1987) (enforcing a three-year restriction on working for or soliciting clients); *Oxford Global Res., Inc. v. Consolo*, 2002 WL 32130445, *6 (Mass. Super. May 6, 2002); *Vantage Tech.*, 17 S.W.3d at 648 (enforcing a three-year, 50-mile restriction); *All Stainless*, 364 Mass. at 779 (two-year noncompete was reasonable when coupled with the limited geographical reach); *Tobin v. Cody*, 343 Mass. 716, 723-24, 180 N.E.2d 652, 657-58 (1962) (extended duration noncompete permissible "[i]n the light of the relatively small area covered"). Indeed, given that Clemens' one-year nonsolicitation commitment does not prevent her from pursuing her career independently with Wells Fargo, or any other Fidelity competitor, the restriction is all the more reasonable and has only a marginal economic impact on Clemens (and indeed far less of an adverse economic impact on Clemens than a noncompetition agreement would). *See Oxford Global Res.*, 2002 WL 32130445 at *6 (finding prohibition on solicitation to be "a reasonable, narrowly tailored approach that permits [the employee] to continue to work"); *Merrill Lynch, Pierce, Fennder & Smith, Inc. v. Dutton*, 844 F.2d 726, 727 (10th Cir. 1988).[6]

Further, the Employee Agreement protects Fidelity's legitimate business interests. As demonstrated below, Fidelity's Confidential Information, including its customers' private

---

[6] Given that reasonable restrictive covenants are enforceable, there is nothing special about this agreement that would render its enforcement inimical to the public interest.

14

information, constitutes a trade secret, or at a minimum, confidential business information. Clemens' use of that information to identify and solicit Fidelity's customers is a violation of the restrictive covenants in paragraph 6 of her Employee Agreement, which expressly prohibit her from using Fidelity's Confidential Information to solicit Fidelity's customers. (Bell App, Exh. C ¶ 6.) Accordingly, the Employee Agreement properly protects Fidelity's legitimate business interest in its trade secrets and other confidential information.

The Employee Agreement also protects Fidelity's goodwill in its customer relationships. (*Id.*) Accordingly, Clemens separately breached her Employee Agreement by using her relationships with Fidelity's customers, and the information that flowed through those relationships, to solicit those customers. As Clemens' husband admitted, Clemens left Fidelity with every intention of taking a handful, *i.e.*, approximately 20, of the Fidelity customers with whom she worked. (Tevis Decl., ¶ 4.) Consistent with that intent, Clemens is attempting to do just that.

Based solely on the limited evidence available to Fidelity at this point, it is already clear that, only moments before tendering her resignation (which was effective immediately with no advance notice), Clemens reached out to an account with five billion dollars in assets to schedule a meeting with the client – which would necessarily need to take place after Clemens left and went to a competitor. (Bell Decl. ¶ 21.) Similarly, as became clear in the week after Clemens separated from Fidelity, Clemens was reaching out to Fidelity customers to solicit them to move their relationship to her new employer, Wells Fargo. Specifically, one client called to obtain Clemens' cell phone number so he could reach Clemens at her new firm, as he had a meeting scheduled with her at 9:00 AM on the very first business day after she left Fidelity and already knew she had left Fidelity. (*Id*. ¶ 13.) Other customers began reporting that Clemens had called

them over the weekend (*id.* ¶¶ 14-15), and still other customer calls soon followed – with Clemens on the line – to transfer their accounts to Clemens' new employer (*id.* ¶¶ 17-18).

As the face of Fidelity (*id.* ¶ 10), Clemens was able – as Fidelity's agent – to maintain and develop those relationships such that she is now in a position to improperly use, and has already improperly used, to unfairly compete with Fidelity for those very customers provided to her by Fidelity. *See Vantage Tech.*, 17 S.W.3d at 645-47 (employee introduced to customers by the company, who develops those relationships for the company, becomes the face of the company and unfairly competes when she uses those relationships to solicit customers for a competitor); *Hasty*, 671 S.W.2d at 473 (same); *Harnett*, 2013 WL 1891308 at *4. Fidelity has already lost customers as a consequence of Clemens' misuse of Fidelity's goodwill in violation of the nonsolicitation provisions in her Employee Agreement. (Bell Decl. ¶¶ 17, 18, 23.) Clemens' violation "is especially true" given that she developed her relationship with Fidelity's customers in tandem with her use of Fidelity's confidential information. *Vantage Tech.*, 17 S.W.3d at 646 (and cases cited); *see also Wordwave, Inc. v. Owens*, 2004 WL 3250472, *2–4 (Mass. Super. Dec. 7, 2004) (information was not sufficient to warrant protection as trade secret, but "coalesce[d]" with customer goodwill to create protectable legitimate business interest).

Finally, Fidelity is also likely to succeed on its claim that Clemens violated the nondisclosure provision of the Employee Agreement. (Bell Decl., Exh. C ¶ 1.) The Employee Agreement defines Fidelity Confidential Information to include all customer information, including customer names, contact information, and financial information. (*Id.*). In addition to having looked up such information on the very day she left with no corresponding Fidelity business reason (Bell Decl. ¶ 20), Clemens must also be in possession of additional Fidelity customer names and contact information, given that she has already contacted many Fidelity

16

customers by phone.[7]  Accordingly, injunctive relief is also appropriate to address Clemens'

breach of the nondisclosure provision in Clemens' contact with Fidelity.  *See*, *e.g.*, *Harnett*, 2013

WL 1891308 at *5-6.

Simply put, whether Clemens' misuse of Fidelity's goodwill is considered separately, or

coupled with her misuse of Fidelity's Confidential Information, Clemens has unfairly competed

with Fidelity in violation of the nonsolicitation and nondisclosure covenants in her Employee

Agreement.  *Vantage Tech.,* 17 S.W.3d at 644, 645-46 ("[t]hese considerations may operate

individually or in tandem to give rise to a properly protectable business interest.") (citing

*AmeriGas Propane, Inc. v. Crook,* 844 F. Supp. 379 (M.D. Tenn. 1993); *Flying Colors of*

*Nashville, Inc. v. Keyt,* 1991 WL 153198 (Tenn. Ct. App. Aug. 14, 1991)); *Wordwave*, 2004 WL

3250472 at *2-4.  Accordingly, Clemens should be enjoined from continuing to do so.[8]

---

[7] Whether Clemens physically took Fidelity's Confidential Information or simply remembers the
information is of no consequence.  Given that an unscrupulous employee could memorize her employer's
information (including, for example, as Clemens presumably – at a minimum – did when looking up
customers on her last day), both Tennessee and Massachusetts will protect employers from the misuse of
remembered confidential information.  *E.g.*, *AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 386,
391; *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840, 282 N.E.2d 921, 924-25 (1972); *Oxford
Global Res.*, 2003 WL 23112398 at *8–9 ("an unscrupulous ex-employee could 'launder' confidential
information by working down a memorized list . . . , methodically performing Internet searches designed
to find the exact person they already have in mind, and saving the results of those searches as a defense
against any claims of breach of confidentiality. . . . [A]n ex-employee who has even a partial memory of
confidential information could use that information to expedite and rapidly narrow an Internet search.").

[8] While Fidelity has not previously had to seek injunctive relief in Tennessee, it has previously had to
seek similar injunctive relief in Massachusetts and elsewhere throughout the country, and has routinely
received injunctive relief of the very type sought here when its former employees misappropriate trade
secret customer information or attempt to solicit customers to transfer their accounts under circumstances
similar to those of this case.  *See, e.g.*, *Fidelity Brokerage Services LLC v. Wilder*, No. 11-3729 (Mass.
Super. Oct. 25, 2011), Tab 12; *Fidelity Brokerage Services LLC v. Alexopoulos,* No. 03-5362 BLS (Mass.
Super. Nov. 14, 2003), Tab 1; *Fidelity Brokerage Services LLC v. Donovan*, No. 03-2286 BLS (Mass.
Super. May 15, 2003), Tab 2; *Fidelity Brokerage Services, Inc. v. Murray*, No. 99-3039 (Mass. Super.
July 13, 1999), Tab 5; *Fidelity Brokerage Services v. Veve*, No. 12-1986 (D. Colo. Aug. 1, 2012), Tab 11;
*Fidelity Brokerage Services v. McNamara*, 2011 WL 2117546 (S.D. Cal. May 27, 2011); *Fidelity Global
Brokerage Group, Inc. v. Gray*, 2010 WL 4646039 (E.D. Va. Nov. 9, 2010); *Fidelity Brokerage Services
v. Franz*, No. 08/9564 (NY S.Ct. Nassau Cty. 2008), Tab 3; *Fidelity Brokerage Services v. Vance*, No.
SACV07-1230 DOC (C.D. Cal. 2007), Tab 10; *Fidelity Brokerage Services v. Umstead*, No. 1:07-cv-347
(E.D. Va. 2007), Tab 9; *Fidelity Brokerage Services v. Rupp*, No. 1:05-cv-00083-JD (D.N.H. 2005), Tab

17

### 3. Injunctive Relief Is Particularly Warranted Under the Circumstances

The Employee Agreement itself expressly entitles Fidelity to injunctive relief for breaches of the nondisclosure and nonsolicitation provisions at issue. This term is specifically enforceable as a substantive component of the parties' agreement to arbitrate. *See E. Bag & Paper Co., Inc. v. Ross*, 2007 WL 2367636, *3 (Mass. Super. June 23, 2007) (representations in contract that a "breach . . . would cause [plaintiff] irreparable injury non-compensable in money damages . . . are not mere words. They are express contract terms."). Jurisdictions around the country likewise enforce such contract provisions. *See, e.g., Dutton*, 844 F.2d at 727-28 ("plaintiff is entitled by the employment contract to the entry of orders protecting the status quo"); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 434 (2d Cir. 1993) ("where a party's request for a status quo injunction pending arbitration is grounded in the words of a contract, specific performance analysis is required"); *RGI, Inc. v. Tucker & Assocs., Inc.*, 858 F.2d 227, 230 (5th Cir. 1988) (agreement to injunctive relief pending arbitration is a "bargained-for provision" which must be enforced to "insure that the arbitration clause of the contract will be carried out as written").

### B. Fidelity Is Likely to Succeed on the Merits of Its Claim for Misappropriation of Trade Secrets

While the foregoing is dispositive of Fidelity's satisfaction of the first prong of this Court's preliminary injunction standard, Fidelity is also likely to succeed on its claims for misappropriation of trade secrets because Clemens is using Fidelity's trade secret customer information to target and solicit Fidelity's high net worth customers.

---

8; *Fidelity Brokerage Services v. Johnson*, No. A04-CA-662-SS (W.D. Tex. 2004), Tab 4; *Fidelity Brokerage Services v. Parker*, No. 04-cv-1027-IEG(LSP) (S.D. Cal. 2004), Tab 6; *Fidelity Brokerage Services v. Rousseaux*, No. JFM-03-CV-01319 (D. Md. 2003), Tab 7.

"Under the Tennessee Uniform Trade Secrets Act ('TUTSA'), the elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *Partylite*, 2006 WL 2370338 at *3 (citing Tenn. Code Ann. §§ 47-25-1701 to 1709 (2005); *Stratienko v. Cordis Corp.,* 429 F.3d 592, 600 (6th Cir. 2005) (citing *Hickory Specialties, Inc. v. B & L Labs., Inc.,* 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979)); *Hauck Mfg. Co. v. Astec Indus., Inc.*, 376 F. Supp. 2d 808, 816-17 (E.D. Tenn. 2005)).

A "trade secret" is defined by the statute as any:

information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

(A)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(B)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702.[9]  Trade secret status requires that "the information is not readily ascertainable by others and derives independent economic value from its secrecy." *Hauck Mfg.*, 376 F. Supp. 2d at 814.

---

[9] TUTSA "is sufficiently broad to include information which at common law would have been considered confidential" pre-TUTSA. *Hamilton-Ryker Grp.,* 2010 WL 323057 at *14.  Under the common law, a trade secret consists of "'any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it.'" *Hickory Specialties*, 592 S.W.2d at 586.  Further, under common law, the factors relevant to determining whether information is a trade secret were: (1) the extent the information is known outside of the business; (2) the extent the information is known by employees and others involved in the business; (3) measures taken to guard the secrecy of the information; (4) value of the information to the business and to competitors; (5) amount of effort or money expended in developing the information; (6) ease or difficulty with which the information could be properly acquired or duplicated by others.  *Wright Medical Technology, Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001).  Tennessee courts continue to consider these elements, even after adoption of TUTSA.  *See Partylite*, 2006 WL 2370338, at *3.

19

Although under Tennessee trade secrets law, customer information frequently does not qualify as a trade secret (typically because it is generally available), *see*, *e.g.*, *Vantage Tech.*, 17 S.W.3d at 645; *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990), here, federal regulations governing customer information mandate that such information be protected from disclosure. Specifically, pursuant to the Gramm-Leach Bliley Act and its implementing federal regulations (commonly referred to as Regulation S-P, *see* 17 C.F.R. Part 248), such information, including simply the fact that an individual is a customer of a specific financial institution (here, Fidelity), is deemed confidential and protected from disclosure.[10] 17 C.F.R. § 248.3. Accordingly, these federal regulations underscore the confidential nature of financial services customer information such as Fidelity's confidential information.[11]

Further, even without regard to Regulation S-P, Fidelity's confidential information would still qualify as a trade secret in Tennessee. First, while the names, addresses, and telephone numbers of many Fidelity customers may be publicly available, the value of Fidelity's customer information is that it identifies which of the people in the world are Fidelity customers, interested in financial services of this kind, and, with respect specifically to Clemens' customers, are high

---

[10] The Federal Gramm-Leach Bliley Act and the SEC's Regulation S-P mandate that Fidelity (and all other financial services companies) preserve the confidentiality of its customers' "nonpublic" information. 17 C.F.R. Part 248. "Nonpublic" information is defined to include even the names of each individual, because under Regulation S-P the fact that a person is identified as being a customer of a certain financial institution is considered "nonpublic" information. *Id.* at 248.3. Accordingly, SEC Administrative Law Judges will impose sanctions and monetary fines for failing to protect financial services customers' information. *See, e.g., In re NEXT Fin. Grp., Inc.*, SEC File No. 3-12738, *9-12, 54, (June 18, 2008), Tab 14 (imposing $125,000 fine relating to NEXT's practices regarding the transmission of customer information when employees moved between NEXT and other brokerage firms); *In re Woodbury Fin. Servs., Inc.*, SEC File No. 3-13437 (April 9, 2009) (imposing a $65,000 fine), Tab 15.

[11] While certain financial institutions have agreed to a "Protocol for Broker Recruiting" (frequently referred to as the "Protocol") through which registered representatives may take customer information as they move among those institutions (provided that they and the firms comply with the requirements of the protocol and obtain waivers of Regulation S-P), Fidelity is not a signatory to the Protocol. (Cvercko Decl. ¶ 9.) Accordingly, the Protocol does not apply to Fidelity, and Fidelity – as well as Fidelity's employees – must continue to maintain its customer's confidential information and not transfer it to another firm or to anyone else.

20

net worth.  (Bell Decl. ¶¶ 5-6.)   The information is confidential and was developed over a long period at great expense to Fidelity.  (Cvercko Decl. ¶¶ 4-6.)  Fidelity spent tens of millions of dollars each year growing and managing its customer list.  (*Id*.)  As explained above, Fidelity instituted effective measures to safeguard the information.  (*Id*. at ¶¶ 7-9.)  These steps include maintaining its trade-secret customer data on password-protected computers, providing access to customer information only to those employees whose jobs require access to the customer data, and maintaining a Confidentiality Policy, educating its employees on the policy, and requiring employees, including Clemens, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity Confidential Information, including Fidelity customer information, outside of Fidelity.  Further, Fidelity does not provide its trade-secret customer data to competitors, and Fidelity employees are not permitted to take with them with, use, or disclose any customer information they leave Fidelity.  (Cvercko Decl. ¶ 8.)

The value of the information to competitors is also clear.  The total assets under management of the accounts for which Clemens was responsible was $466 million – representing approximately half of the total assets under management at the entire Johnson City investor center.  (Bell Decl. ¶ 6.)  Thus, not surprisingly, Clemens was satisfied if she could take a handful of them for herself and her new employer, Wells Fargo.  (Tevis Decl. ¶ 4.)  Consistent therewith, Fidelity has invested a substantial amount of time and money to compile its confidential customer information, and vigilantly protects the confidentiality of its customer information by limiting access to this information, requiring employees with access to sign restrictive covenants, and by reminding employees of Fidelity's confidentiality policy.  Fidelity derives tremendous economic value from the fact that such information is not available to its competitors.  To permit a competitor such as Clemens unfettered access to this information

21

would give her a significant advantage over Fidelity in that he could utilize the information without having made the necessary investments in compiling it.  *Fidelity Brokerage Services LLC v. Wilder*, No. 11-3729, *2-3 (Mass. Super. Oct. 25, 2011) (finding that Fidelity's customer information constitutes a trade secret under the factors set forth in *Jet Spray Cooler*, 361 Mass. 835 (1972)).

Despite the steps Fidelity took to keep its information confidential, Clemens has used Fidelity's trade secret customer information to solicit Fidelity customers for the benefit of her new firm.  As set forth above and in the accompanying declarations – and consistent with Clemens' husband admission that Clemens hoped to "tak[e] a handful" of Fidelity's customers – in just the days since Clemens' separation, Fidelity has already learned of numerous customers whom Clemens has solicited on behalf of her new firm, representing millions of dollars of assets under management.  Several customers have already closed their Fidelity accounts and informed Fidelity that they plan to transfer the management of their assets away from Fidelity to Clemens. (Bell Decl. ¶¶ 17-18.)  Thus, Clemens has improperly used Fidelity's trade secret customer information to solicit Fidelity customers and Fidelity has demonstrated a likelihood of success on its claim for misappropriation of trade secrets under TUTSA.

III.    **AN INJUNCTION WILL SAVE FIDELITY FROM CONTINUED IRREPARABLE INJURY**

Tennessee courts consistently find that the misappropriation of confidential information, misuse of company goodwill, and the subsequent diversion of customer relationships present an immediate threat of irreparable harm for which money damages are inadequate or incalculable. *See, e.g., Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 425-46 (6th Cir. 2006); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); *AmeriGas*, 844 F. Supp. at 390; *Int'l Sec. Mgmt. Grp., Inc. v. Sawyer*, 2006 WL 1638537, *8 (M.D. Tenn. June 6, 2006).

Irreparable harm can consist of the loss of direct sales as well as customer referrals to other potential customers.  *AmeriGas*, 844 F. Supp. at 390.  "The inability to properly estimate

22

damages weighs in favor of issuance of a preliminary injunction." *AmeriGas*, 844 F. Supp. at 390; *see NACCO*, 366 F. Supp. 2d at 609-610. An injunction is also appropriate where, as here, the information at issue "would be extremely useful to competitors." *Honda Research & Dev. Co., Ltd v. Loveall*, 687 F. Supp. 355, 356 (E.D. Tenn. 1985); *see also, Corporate Exp. Prods.*, 2002 WL 1901902 at *26 (competitor's access to confidential information constitutes a basis for injunctive relief).

Furthermore, injury to Fidelity is incalculable. As a recent Massachusetts case recently observed in a similar context: "It is impossible to predict the loss of business, trade secrets, and goodwill which this breach may trigger. One can never anticipate the future assets which might be owned by these very successful and wealthy families . . . who are lost to Fidelity due [to the former employee's] conduct." *Wilder*, No. 11-3726 at *4; *see also Harnett*, 2013 WL 1891308 at *8; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F.2d 1098, 1102 n.8 (5th Cir. 1981) ("Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us."). Denial of injunctive relief would also leave Fidelity "vulnerable to the same conduct from other employees." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin*, 1991 WL 83163, *6 (N.D. Ill. May 9, 1991).

As the cases discussed above demonstrate, Fidelity faces multiple threats of irreparable harm and the requested injunctive relief should be granted.

## IV.   AN INJUNCTION WILL NOT HARM OTHERS, AND THE PUBLIC INTEREST SUPPORTS INJUNCTIVE RELIEF

The benefit of injunctive relief to Fidelity far outweighs any detriment to Clemens, and serves the public interest. An injunction would protect Fidelity's valuable trade secrets, goodwill, business reputation, and contract rights. *See, e.g., Merrill Lynch, Pierce, Fenner &*

23

*Smith, Inc. v. Kramer*, 816 F. Supp. 1242, 1248 (N.D. Ohio 1992) ("To deny injunctive relief in this case would . . . jeopardize the integrity of the securities industry and to the detriment of the public interest [and] . . . would cast doubt on the integrity of contractual agreements."). Where injunctive relief would merely require the defendants to obey existing law and their existing duties and/or contractual obligations, the balance of the hardships favors the employer. *See Darwin Partners*, 2000 WL 33159238, *5 (Mass. Super. Mar. 24, 2000).

Fidelity is not attempting to prevent Clemens from working in the industry, competing for new accounts, or accepting business from customers who seek out his services, but instead asks only that Clemens be ordered to comply with her contractual obligations and refrain from competing *unfairly* through the unauthorized solicitation of Fidelity customers and the unauthorized use of Fidelity's trade secret customer information.

Enforcing Clemens' Employee Agreement and issuing an injunction is consistent with public policy and serves the public interest. "Tennessee has a strong public policy in favor of upholding contracts." *AmeriGas*, 844 F. Supp. at 390; *see FirstEnergy Solutions Corp. v. Flerick*, 2013 WL 1500452, * 8 (6th Cir. Apr. 15, 2013) (citation omitted); *Int'l Sec. Mgmt. Grp.*, 2006 WL 1638537, *18; *Harnett*, 2013 WL 1891308, *10; *see also Wilder*, 11-3726 at *4. Moreover, Tennessee's adoption of the UTSA evidences a public policy of strongly protecting employer trade secrets, while the Federal Gramm-Leach Bliley Act and the SEC's Regulation S-P evince a public policy of protecting customers' information. *See generally Carborundum Co. v. Williams*, 468 F. Supp. 38, 40 (E.D. Tenn. 1978) *aff'd*, 590 F.2d 334 (6th Cir. 1978) (citations omitted); *Wilder*, 11-3726 at *4 ("The public's interest and security is served by the protection of personal financial information."). The requested injunction furthers these public interests, while permitting Clemens to continue working for her current employer in precisely the same capacity

24

in which she was hired – though without unfairly using Fidelity's trade secrets, confidential information, or goodwill.  Accordingly, any potential hardship that Clemens might suffer due to enforcement of the Employee Agreement and protection of Fidelity's legitimate business interests is extremely limited and certainly far outweighed by the harm that Fidelity will suffer if Clemens' breach goes unchecked.  *See, e.g., Harnett,* 2013 WL 1891308 at *9; *Stone Legal*, 2003 WL 914994 at *6; *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 442-43 (D. Mass. 2010).  Moreover, as also noted above, "[p]ublic policy requires that unfair competitors must not be allowed to profit by their wrongful methods . . . ."  *Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 170, 385 N.E.2d 1349, 1356 (1979); *see also Acorida Ne., Inc. v. Academic Risk Res. & Ins., LLC*, 2005 WL 704870, *5 (Mass. Super. Jan. 5, 2005) ("absence of injunctive relief would in effect reward the defendants for their conduct").

## V.  INJUNCTIVE RELIEF IS REQUIRED BEFORE FIDELITY CAN OBTAIN AN EXPEDITED ARBITRATION ON THE MERITS BEFORE FINRA

Fidelity has filed a Statement of Claim with FINRA seeking to resolve the ultimate merits of this dispute in an expedited arbitration hearing.  As stated above, if this Court does not grant the injunction Fidelity requests, Fidelity will be required to proceed in a standard-track arbitration before FINRA, which would delay a hearing for a year or more.  Thus, Fidelity's election to seek injunctive relief from both FINRA and this Court is not only consistent, but is required under the FINRA Code of Arbitration Procedure.

## CONCLUSION

For the foregoing reasons, Fidelity respectfully requests that this Court grant its Motion for Injunction Relief and enter Fidelity's proposed injunction order against James Clemens pending expedited arbitration on the merits before FINRA or further order of this Court.

Respectfully submitted,

**PAINE, TARWATER, AND BICKERS, LLP**

/s/ Daniel C. Headrick
Matthew J. Evans (BPR #017973)
Daniel C. Headrick (BPR #026362)
900 South Gay Street, Suite 2200
Knoxville, Tennessee  37902-1821
(865) 525-0880 (phone)
(865) 521-7441 (fax)
*Counsel for Fidelity Brokerage Services LLC*

Of Counsel:

Russell Beck (*pro hac vice* pending)
Stephen Riden (*pro hac vice* pending)
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts  02110
(617) 500-8660
Fax (617) 500-8665

Stacey N. Schmidt (*pro hac vice* pending)
FMR LLC
82 Devonshire Street, F6B
Boston, Massachusetts 02109
(617) 392-1982
Fax (617) 385-6850

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been served upon the following
via Federal Express, overnight delivery, addressed to:

Melissa Clemens
3503 Pine Timbers Drive
Johnson City, TN 37604

This the 19th day of September, 2013.

/s/ Daniel C. Headrick