# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE DIVISION

| | | |
|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 2:13-cv-00239** |
| v. | ) | **Judge Ronnie Greer** |
| | ) | **Magistrate Judge Dennis H. Inman** |
| MELISSA CLEMENS, | ) | |
| | ) | |
| **Defendant.** | ) | |

## CLEMENS' OPPOSITION TO FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Without prejudice, Defendant Melissa Clemens ("Clemens") submits her brief in opposition to Plaintiff Fidelity Brokerage Services LLC's ("Fidelity") Motion for a *Temporary Restraining Order and Preliminary Injunction* (Doc. Nos. 5 and 6) and any further injunctive relief.[1] As demonstrated below, Fidelity's motion must be denied.

## INTRODUCTION

Fidelity's request for injunctive relief is premised on an unfounded and unsubstantiated assertion that Clemens has misappropriated and misused Fidelity's confidential customer lists and information when she resigned from Fidelity moved to Wells Fargo Advisors ("WFA") on September 6, 2013. Not only is there simply no evidence to indicate that Clemens misappropriated or misused any truly confidential or proprietary information to Fidelity, but Fidelity's request for injunctive relief is nothing more than a veiled attempt to restrict Clemens from communicating at all with her former Fidelity customers. Fidelity is seeking to chill competition and unfairly restrict customer rights to select the broker of their choice. This

---

[1] Clemens is appearing specially only to contest Fidelity's Motion and without prejudice to or waiver of jurisdiction, service, process, arbitration or any other theories of avoidance or defense.

restriction violates both The Financial Industry Regulatory Authority's Rules and Regulations[2] and Tennessee law. Fidelity's actions also ignore FINRA Rules 11870 and 2110-7, which make it clear that clients must have free access to registered representatives of their choice.

Fidelity has failed to satisfy the strict standards for injunctive relief. There is absolutely no evidence that the Clemens took or used any of Fidelity's confidential information. Fidelity's case rests only inadmissible hearsay, double-hearsay and speculation drawn from that inadmissible evidence. However, Tennessee law is very clear that customer contact information remembered by a former employee or readily available in the public domain is not confidential information, especially when the employee developed the customer relationships, as in this case.

Nor is there any proof whatsoever that the Clemens solicited Fidelity's customers. Clemens only announced her departure from Fidelity and her affiliation with WFA as she was permitted (and was the courteous thing) and had an obligation to do. Clemens never asked any client to transfer their accounts to WFA. The fact that clients chose to transfer their accounts, without more, does not establish solicitation. Fidelity's attempt to prevent Clemens from ever talking to her clients renders the Employment Agreement grossly-overbroad, unreasonable, and unenforceable.

Finally, Fidelity's employment agreement with Clemens violates Tennessee law and is thus void.

---

[2] "The Financial Industry Regulatory Authority (FINRA) is the largest non-governmental regulator for all securities firms doing business in the United States. Created in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, FINRA is dedicated to investor protection and market integrity through effective and efficient regulation and complementary compliance and technology-based services." *See* http://www.finra.org.

Case 2:13-cv-00239-JRG-DHI   Document 22   Filed 09/22/13   Page 2 of 27   PageID #: 433

## APPLICABLE LAW

FINRA Rule 13804(b)(4) provides that "[t]he legal standard for granting or denying a request for permanent injunctive relief is that of the state where the events upon which the request is based occurred, or as specified in an enforceable choice of law agreement between the parties."[3]  Clemens purportedly executed an "EMPLOYEE AGREEMENT" ("Agreement") with Fidelity.  Section 10 of the Agreement provides that "[t]his Agreement is governed in accordance with Massachusetts law and is signed under seal."[4]  However, Tennessee law holds that the Agreement's choice of law provision is not controlling:

> Tennessee follows the rule of *lex loci contractus*.  This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent…If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met….***The parties' choice of another jurisdiction's law must not be 'contrary to a fundamental policy of a state having [a] materially greater interest and whose law would otherwise govern.***

*Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 650-51 (Tenn. Ct. App. 2000) (emphasis added).

Tennessee has a long-standing and strong fundamental policy against non-competition and non-solicitation agreements.  According to the Tennessee Supreme Court, "[s]uch covenants are not favored in Tennessee because they are in restraint of trade.  Further . . . the modern trend is to construe covenants favorably to the employee."[5]  As a result, Tennessee courts routinely

---

[3] FINRA Rule 13804(b)(4), attached as Ex. 1.

[4] *See* Clemens' "EMPLOYMENT AGREEMENT," attached as Ex. 2 to Plaintiff's Complaint, at ¶ 10.

[5] *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984) (citing *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 365 (1966) (holding non-competition covenant was not enforceable because there was not protectable business interest)).

find non-competition and non-solicitation provisions in employment agreements unenforceable and have refused to grant preliminary injunctions in such situations.[6]  Because Tennessee law would otherwise govern, the Agreement's choice of law provision is void and only Tennessee law is applicable to this proceeding.[7]

## ARGUMENT

I.  **FIDELITY'S MOTION SHOULD BE DENIED BECAUSE IT CANNOT MEET THE HEAVY BURDEN REQUIRED TO WARRANT INJUNCTIVE RELIEF.**

To obtain temporary injunctive relief, Fidelity bears a heavy burden of proof in establishing the following four necessary factors:

(1)    A substantial likelihood of success on the merits;

(2)    Irreparable injury during the pendency of the litigation if the injunction is not granted;

(3)    That such threatened injury to the requesting party outweighs the harm that the injunction would inflict upon the enjoined party; and

(4)    That granting the injunctive relief will not harm the public interest.[8]

In the Sixth Circuit, a court must balance these factors "in light of the overall goals of the preliminary injunctive relief, preserving the status quo of the parties…".[9]  If Fidelity fails to carry its burden on any four of these factors, this Court must refuse to grant the TRO.  In the

---

[6] *Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W.3d 647 (Tenn. 2005); *Hasty*, 671 S.W.2d at 472.; *Kaset v. Combs*, 434 S.W.2d 838 (Tenn. Ct. App. 1968).

[7] However, as Plaintiff acknowledges, "both Massachusetts and Tennessee share similar policies concerning their approach to restrictive covenants."  (Doc. No. 6, p. 12.)

[8] *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1975); *Tenn. Imports, Inc. v. Filippi*, 745 F. Supp. 1314, 1329 (M.D. Tenn. 1990).

[9] *Tenn. Imports, Inc.*, 745 F. Supp. at 1329.

present case, Fidelity has failed to establish the necessary factors for granting injunctive relief; therefore, the Court should deny Fidelity's request.

A.    THE AGREEMENT IS NOT ENFORCEABLE BECAUSE IT IS NOT REASONABLE.

The Court should deny Fidelity's Motion because its non-solicitation agreement, as construed by Fidelity, is not enforceable.  Fidelity asserts its non-solicitation agreement prevents Clemens from using public customer contact information to announce her new affiliation with WFA.  Fidelity's grossly-overbroad no-contact interpretation renders the Agreement *per se* unreasonable.

In order for a non-solicitation agreement to be valid, it must be reasonable.  Tennessee courts generally hold that reasonableness must include *both* of the following: (1) a legitimate business interest in need of protection, and (2) reasonable time and territorial limitations.[10] Fidelity cannot meet either requirement.  While Tennessee recognizes that trade secrets and confidential information are legitimate business interests, they exclude from such protection the knowledge, skill, and training acquired from an employer because an employer cannot restrain ordinary competition.[11]  Instead, there must be "special facts present over and above ordinary competition . . . such that without the covenant not to compete the employee would gain an unfair advantage in future competition . . . ."[12]  Fidelity is seeking to restrain the ordinary competition customary in the brokerage industry by attempting to assert an illegitimate business interest in customer contact information.  Tennessee does not consider customers' names,

---

[10] *Murfreesboro Medical Clinic, P.A.*, 166 S.W.3d at 679; *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 32-33 (Tenn. 1984); *Hasty*, 671 S.W.2d at 473.

[11] *Hasty*, 671 S.W.2d at 473 (citing *All Stainless, Inc. v. Colby*, 308 N.E.2d 481, 486 (Mass. 1974)).

[12] *Id.* (citing *Matthews v. Barnes*, 293 S.W. 993, 994 (Tenn. 2007)).

Case 2:13-cv-00239-JRG-DHI   Document 22   Filed 09/22/13   Page 5 of 27   PageID #: 436

addresses, and phone numbers to be confidential information.[13]  In fact, enforcing the agreement would unfairly restrain ordinary competition.

Further, Clemens learned her customers' names through the course of her employment by using her own efforts and relationships, which does not create an unfair advantage over Fidelity. Contrary to Fidelity's claims, Clemens was encouraged to generate her own customer base. From May 2010 through April 2013, Clemens' client base was a "closed book," meaning Fidelity did not provide her with leads or customers.  Rather, Clemens was encouraged by her managers to join civic organizations and solicit customers from church, acquaintances, family and friends.  (M. Clemens Dec., attached as **Ex. 2**, at ¶ 2.)  Over half of the Fidelity customers who transferred their account to WFA for Clemens to manage consist of family and friends, including for example, her parents, brother, brother's ex-wife, her Mary Kay sales representative and her husband, and a church friend's husband.  (*Id.* at ¶ 14.)  As a result, the non-solicitation covenant is invalid.

The Agreement is also invalid because it has no territorial limitations at all.  Tennessee law expressly requires that restrictive covenants contain reasonable territorial limitations,[14] but Fidelity's Agreement fails to specify *any geographic limitations whatsoever* on the scope of the non-solicitation provisions.[15]  "[N]on-competition covenants, which embrace territory in which the employee never performed services for his employer, are unreasonable and unenforceable."[16]

---

[13] *B&L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 214 (Tenn. Ct. App. 2004) (holding that customer names are not confidential information because of the availability of the information through public sources.)

[14] *Allright Auto Parks, Inc. v. Berry*, 409 S.W. 2d 361, 363-64 (Tenn. 1966).

[15] *See* Employment Agreement, attached as **Ex. 2** to the Complaint, at ¶ 16.

[16] *Id.*

Because Fidelity's Agreement is completely unlimited with respect to the territory it seeks to restrict, it is therefore not enforceable.

Even though a restriction against soliciting an employer's customers may substitute for a geographic limitation, *see Hamilton-Ryker Group, LLC v. Keymon*, 2010 WL 323057, at *12 (Tenn.Ct.App. Jan. 28, 2010), Fidelity's interpretation of the Agreement's non-solicitation requirement to prohibit all customer contact is unreasonable. Clemens spent two years cultivating her own client base during which Fidelity did not provide her with leads or customers. At least half of the customers who transferred their accounts to WFA were customers Clemens developed. Further, Clemens did not solicit any of Fidelity's customers. Rather, she only used public information to contact and announce her affiliation with WFA.

Accordingly, Fidelity's request for injunctive relief should be denied.

## B. FIDELITY CANNOT SUCCEED ON THE MERITS.

Fidelity's entire argument centers on its belief that the names, addresses and phone numbers of its customers constitute "confidential information," but Fidelity unilaterally attempts to deem them "trade secrets." Fidelity will not succeed on the merits of this case because such information is not afforded "trade secret" status under Tennessee law, the FINRA rules, or under the general practices in the brokerage industry.

At the heart of this matter is Clemens' maintenance of her clients' contact information, many of whom were customers that Clemens recruited to Fidelity based solely on her own efforts and networking. As shown below, however, Fidelity's "proof" that Clemens solicited customers is based only on inadmissible hearsay, double-hearsay and speculation drawn from that inadmissible evidence. That is no proof at all, and is insufficient to support Fidelity's claims.

Further, there is absolutely no proof that Clemens took or used Fidelity's confidential information or trade secrets when she contacted her clients. Rather, she only used information available to the public, which is clearly does not constitute trade secrets, as Fidelity admits in its Motion.

Finally, the fact that FINRA regularly refuses to enjoin departing brokers from contacting and continuing to serve their former clients shows that Clemens' actions in this case are customary and allowed in the financial industry. Fidelity will not prevail on the merits of this case because Clemens did nothing wrong. Clemens' use of publicly available information to contact her former clients to announce her affiliation with WFA simply does not involve the solicitation Fidelity customers, or the use of any confidential information owned by Fidelity.

**1.    There Is Absolutely No Evidence that Clemens has Solicited her Former Clients.**

There is absolutely no evidence that Clemens solicited any of her former clients after resigning. Rather, Fidelity's "proof" consists only of inadmissible hearsay, double-hearsay and unsupported speculation. It is telling that Fidelity's primary witness has no personal knowledge of Clemens' alleged solicitations, but can only repeat what he claims others told him during his "investigation." For example, Bell states:

1.    He received "reports that immediately after Clemens resigned . . . she was contacting Fidelity customers to solicit their business," (Bell. Dec.¶ 12);

2.    He was told by Lindsey Wortman, a Fidelity Account Executive, that an unknown customer called and said that "Clemens had called him over the weekend and they had scheduled a meeting . . . ," (Bell Dec., ¶ 13);

3.    He was told a customer visited the branch on September 9, 2013 and "reported that Clemens had called his home on Saturday," (Bell Dec. ¶ 14);

4.    He was told that on September 9, 2013, a "customer reported that Clemens called him on Saturday night," (Bell Dec., ¶ 15);

5.     He was told by Anthony Tevis that Clemens' husband stated Clemens "hoped to take at least 20 of her Fidelity Customers with her to Wells Fargo," (Bell Dec., ¶ 16); and

6.     He was told that Clemens called Fidelity with customers on the phone with her, and that the customers wanted to liquidate both of their accounts. (Bell Dec., ¶¶ 17 and 18.)

Based only on this inadmissible hearsay and double-hearsay evidence, Bell speculates Clemens used confidential information to solicit former customers. (Bell Dec., ¶ 12.) There is no substantial likelihood Fidelity will succeed on the merits of its claims based on inadmissible hearsay.

Similarly, the declaration of Fidelity's other witness, Anthony Tevis, is inadmissible hearsay recounting what he allegedly saw on the internet and heard from Clemens' husband. (Tevis Dec., ¶¶ 3-5.) Further, Clemens' husband, Jeremy Ray Clemmer, denies he made the statements contained in Mr. Tevis' Declaration, except to tell Mr. Tevis that Clemens resigned because WFA made her a good offer with an upfront payment, and Clemens was hopeful to have a more flexible schedule. (J. Clemer Dec., attached as **Ex. 3**, at ¶ 2.)

The only other evidence Fidelity offers is Mr. Bell's assertion that Clemens look-up report "showed that she had looked up seven customers on her last day. Only one of these look ups had a corresponding Siebel note." (Bell Dec., ¶ 20.) From this very limited information, Bell conjectures that, "[t]his is very unusual conduct and strongly suggests to me that she was looking up these customers for the sole purpose of obtaining confidential customer information to take with her when she left Fidelity." (*Id.*) However, as Clemens explains in her Declaration, Fidelity's practice was to enter Siebel notes for each customer contact, not for every look up. On September 6, 2013, the only contact she had was with customer S.G. who called to inquire about his accounts. As was her usual practice, Clemens returned the call and left a message to set up a phone appointment to discuss the customer's concerns. (**Ex. 2**, at ¶ 4.) On September 9, 2013,

after Clemens resigned from Fidelity, a Fidelity representative called customer S.G. to discuss his concerns. (*Id.*; Bell Dec., Ex. F.) Clemens did not call or meet with customer S.G. since resigning from Fidelity. (**Ex. 2**, at ¶ 4.)

Clemens acknowledges that, based on publicly available information, she contacted several Fidelity customers to announce her new affiliation with WFA. WFA made it very clear to Clemens that she was not to solicit Fidelity's customers, but was only permitted to announce her departure from Fidelity by stating her name and that she had moved to WFA and providing her new contact information. In fact, WFA provided her with a written copy of guidelines to follow when she made her "wedding announcement," which Clemens signed and followed. (**Ex. 2**, at ¶ 7, and Ex. A attached thereto.)

Further, contrary to Mr. Bells assertion, Clemens did not tell him "she was comfortable with the advice of her attorneys had been giving her and how she was handling things." (Bell Dec., ¶ 11.) Rather, Clemens told Mr. Bell directly and several times, in response to his repeated questions, that she was not taking and had not taken any Fidelity confidential information or other property. (**Ex. 2**, at ¶ 6.)

Clemens made her "wedding announcement" following the guidelines provided by WFA to customers S.J. and H.H., both of whom have not moved their accounts to WFA. (**Ex. 2**, at ¶¶ 10 and 11.) She also contacted customers HC and BC stating she left Fidelity for WFA and provided her new contact information. HC provided Clemens with their new contact information as they had recently moved. HC also said, "[t]ell me what I need to do to move my account over." (*Id.* at ¶ 12.) As noted in Mr. Bell's Declaration at Paragraph 18, HC and BC contacted Fidelity with Clemens to move their account to WFA. (Bell Dec., ¶ 18.) However, Clemens did

not solicit HC and BC to move their account.  (**Ex. 2**, at ¶ 9.)  Rather, HC and BC asked Clemens how they could move their account to WFA.

Similarly, Clemens contacted customer E.G.  Clemens obtained E.G.'s phone number through an internet service.  Clemens advised E.G. she moved to WFA and provided her new contact information.  E.G. was a former WFA client.  After asking Clemens several questions about WFA's services, E.G. stated she wanted to move her accounts back to WFA to continue working with Clemens.  (**Ex. 2**, at ¶ 13.)

Clemens made her "wedding announcement" to protect her clients' interests and allow them to contact her if they chose to do so.  FINRA has specifically ruled that such "announcements" are not considered solicitations.[17]  At no time did Clemens solicit Fidelity's clients to move their accounts to WFA.  If the clients requested information about Clemens' new position, she responded.  (**Ex 2**, ¶ 9.)  Fidelity has not proven, and cannot prove that Clemens improperly solicited her former clients.

> **2.      There Is No Evidence that Clemens Departed Fidelity with any of its Trade Secrets.**

The entire basis of Fidelity's lawsuit is Clemens' potential solicitation of Clemens' former clients using Fidelity's confidential information, which Clemens has not done.  Although Fidelity has asserted several claims, the entire purpose of its lawsuit is to prevent Clemens' customers from transferring their accounts to be managed by Clemens and her new employer, WFA.  Tennessee law defines a "trade secret" to mean information that:

> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

---

[17] *Smith Barney v. Henshaw, Wachovia Securities, LLC* FINRA Case No. 09-00406 (February 5, 2009), attached as **Ex. 4**.

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). Customer information, i.e. names, addresses, phone numbers, all available in a phone book or the internet, are not "confidential information" under Tennessee law.

### (a) Tennessee law controls what information is deemed "confidential."

Absent a valid non-solicitation agreement, a former employee may rely on his memory and the general information he acquired while working for his former employer in contacting customers.[18] Clemens' actions in this case do not involve customer financial information such as portfolio descriptions, special pricing, or special needs. Nor do they involve specific information concerning the financial history of customers, account balances, account numbers, or similar information. Rather, this case involves Clemens' use – through her own memory and publicly available information – client names, addresses and phone numbers, and not the release of any confidential information owned by Fidelity.

To qualify as a protectable "trade secret" under the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1702, *et. seq.*, the information must be *both* "*not readily ascertainable by proper means by other persons*" *and* subject to reasonable efforts to preserve confidentiality.[19] The Tennessee Court of Appeals explained that the relevant material "must be

---

[18] *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602 (Tenn. Ct. App. 1998) (noting that remembered information, specific needs and habits of customers, and personal relationships with customers are not considered to be confidential information.) *See also B& L Corp.*, 162 S.W.3d at 214 (Tenn. Ct. App. 2004).

[19] *See Venture Express, Inc.*, 973 S.W.2d at 606 (noting that information that is of public knowledge or that is easily ascertainable is not a trade secret and not confidential.)

difficult for anyone outside the confidential relationship to acquire . . . by proper means."[20] However, the employee may use the "general knowledge, skill and expertise he acquired over the course of his employment" because such information is not the property of the employer.[21]  In fact, Tennessee excepts three specific types of information from confidentiality: (1) remembered information, (2) needs and habits of individual clients, and (3) personal relationships created between an employee and a client.[22]  Thus, customer information used by former brokers is not protectable in such circumstances, unless the information actually belongs to the employer and is truly created confidentially.

While Fidelity argues the Agreement provides customer names and addresses are confidential information, that does not, *ipse dixit*, make them so.  First, the Agreement's own definition of "Confidential Information" excludes customer names and addresses because they are public information.  The Agreement provides, "[c]onfidential information consists of all information pertaining to the business of any of the Fidelity Companies that is not known to the public at the time made known to the Employee."[23]  Customer contact information, including names, addresses phone numbers are known publicly and do not fall in the agreement's

---

[20] *Wright Medical Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001) (citing *Hickory Specialties, Inc. v. B&L Laboratories, Inc.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979)).

[21] *Id.* at 590.

[22] *Venture Express, Inc.*, 973 S.W.2d at 606 (citing *Data Processing Equip. Corp. v. Martin*, 1987 Tenn. App. LEXIS 3150, at *6-7, 1987 WL 30155, at *5 (Tenn. App. Dec. 30, 1987); *Stangenberg v. Allied Dist. & Bldg. Serv. Co.*, 1986 Tenn. App. LEXIS 3118, *12, 1986 WL 7618, at *7 (Tenn. App. July 9, 1986)).

[23] *See* Employment Agreement, attached as Ex. 2 to Complaint, at ¶ 1.

definition of "confidential information." Second, the breadth of the Agreement purports to make nearly every scrap of paper and document at Fidelity a trade secret.[24]

Third, and most importantly, Clemens did not take any pre-existing list or any other Fidelity property. In advance of her departure from Fidelity, Clemens cleaned out her office. She used Fidelity's shredder in the Operations Center to destroy old and outdated Fidelity material she had accumulated over the years. She even made a point of holding up those documents to the security camera in the Operations Center in an effort to be fully transparent during her departure. (**Ex. 2**, at ¶ 3.) After resigning from Fidelity, Clemens took only her personal possessions, including a round mirror, family pictures, some awards and her purse. Clemens did not take *anything* belonging to Fidelity. (**Ex. 2**, at ¶¶ 5 and 8.)

The ability to ascertain client names and their contact information through memory and publicly available sources means those items are not protectable under Fidelity's Agreement. Fidelity agrees as much, admitting "under Tennessee trade secrets law, customer information frequently does not qualify as a trade secret (typically because it is generally available)." (Doc. No. 6, p. 20.)[25] Further, prior arbitration decisions by the NASD (now FINRA) have specifically

---

[24] *Id.*

[25] While admitting Tennessee law does not consider customer contact information a trade secret, Fidelity attempts to argue the Graham-Leach Bliley Act and its implementing federal regulations (Regulation S-P, 17 C.F.R. Part 248), deems customer information confidential and protected from disclosure. (*See* Doc. No. 20, p. 20 and n.10.) The Act was not intended to protect companies like Fidelity from departing brokers using public information to contact former customers. Rather, the Act declared it to be "the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). The Act is designed to protect customers from financial institutions, not financial institutions from departing brokers. Indeed, the opinions cited by Fidelity, *In re NEXT Fin. Grp., Inc.*, SEC File No. 3-12738 (June 18, 2008), and *In re Woodbury Fin. Servs., Inc.*, SEC File No. 3-13437 (April 9, 2009), both involve a financial institution's failure to safeguard private customer information, not a departing broker's lawful customer contact using public information.

held that customer names, addresses and telephone numbers *are not confidential*.[26]  Fidelity's

claim for misappropriation of trade secrets and breach of contract fail as a matter of law because

Fidelity cannot provide any evidence that Clemens improperly took Fidelity's confidential

information or obtained any customer information that was not already in the public forum.

> **(b)     The financial investment industry recognizes that customer
> names and addresses are not considered trade secrets or
> confidential information.**

It is now the standard industry practice that when a registered representative moves from

one firm to another, he or she takes with him customer names, addresses and telephone numbers.

It is also the recognized industry practice that the leaving representative contacts his or her

customers and advises them of the change.[27]

Furthermore, over 300 major brokerage firms in the United States (Wells Fargo Advisors;

Morgan Stanley Smith Barney; Merrill Lynch; UBS Financial Services, Inc; Stephens, Inc.;

StillPoint Advisors, Inc.; Advest, Inc. (AXA); and UBS International Inc.) have entered into the

"Protocol for Broker Recruiting."[28]  Although Fidelity is not a signatory to this Protocol, it is

relevant to Fidelity's present attempt to keep customer names and addresses confidential.

The Protocol shows that the brokerage industry does not regard the information Fidelity

seeks to protect as a "trade secret":

---

[26] *See Merrill Lynch v. Stark*, NASD Case No. 02-05187 (Sep. 19, 2002) (denial of an injunction where the panel held that "customer names and addresses and telephone numbers are not confidential").

[27] *See Morgan Stanley DW, Inc. v. Frisby*, 163 F.Supp. 2d 1371, 1379 (N.D. Ga. 2001) ("It is widely understood in the brokerage industry that confidential agreements executed by the account executives are not construed so as to prohibit those account executives from contacting their former clients when they change jobs.  To so construe agreements of that type would put an end to the mobility of account executives that has been a hallmark of the brokerage industry.").

[28] *See* Protocol for Broker Recruiting, attached as **Ex. 5**.

> When [registered representatives] move from one firm to another
> and both firms are signatories to this protocol, they may only take
> the following account information: client name, address, phone
> number, email address and account title of the clients that they
> serviced while at the firm ("the Client Information") and are
> prohibited from taking other information.[29]

Recognizing the industry custom and practice, and recognizing that Clemens is accused of doing nothing other than engaging in the industry custom and practice, this Court should deny Fidelity's Motion.

### 3. FINRA arbitrators routinely deny permanent injunctions and dissolve interim injunctions.

Fidelity will not prevail on the merits because FINRA arbitrators routinely deny claims like those asserted by Fidelity. FINRA routinely refuses to enjoin brokers from serving their clients. Indeed, Fidelity sought a TRO in this forum likely because it knows it is unlikely that neither a TRO nor a Preliminary Injunction would be granted in the FINRA forum.

Arbitrators have denied requests like Fidelity's on countless occasions.[30] In fact, FINRA arbitrators have actually enjoined other brokerage firms from interfering with a departing broker's efforts to contact and serve his clients,[31] and have established that "it is inconsistent with just and equitable principles of trade for a member or person associated with a member to

---

[29] *Id.*

[30] *See, e.g., First Inst. Sec. v. PaineWebber, et. al.*, NASD No. 00-00739 (March 2, 2000); *Malizia v. Merrill Lynch*, NASD Case No. 95-02230 (July 10, 1995); *Doss v. Merrill Lynch*, NASD Case No. 95-02079 (May 23, 1995); *Murphy v. Merrill Lynch*, NASD Case No. 93-04885; *International Assets Advisory Corp. v. Morgan Stanley Dean Witter & Co.*, No. 98-04339, 1999 NASD Arb. Lexis 337, at *4 (April 19, 1999); *Olde Discount Corp. v. Siwik*, No. 00-360, 2000 WL 1637744 (N.A.S.D. September 20, 2000); *Banc of America Inv. Serv., Inc. v. Persons, et. al.*, No. 00-4952, 2001 WL 260105 (N.A.S.D. January 16, 2001), attached collectively as **Ex. 6**.

[31] *See Kinkead v. Merrill Lynch*, NASD Case No. 00-03730 (Sep. 2, 2000) (arbitrators dissolved the federal court injunction and enjoined Merrill Lynch from interfering with the rights of the customers to do business with their brokers), attached as **Ex. 7**; *Seramba v. Merrill Lynch*, NASD Case No. 99-03044 (July 9, 1999).

interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative."[32]

Additionally, courts across the nation have noted that most NASD (now FINRA) panels have refused to issue injunctions. For instance, in *Prudential Securities v Carey*, the court recognized sixty (60) NASD decisions ***denying injunctive relief***.[33] In *Morgan Stanley DW, Inc. v. Frisby*,[34] the court noted 10 NASD decisions where NASD panels refused to issue an injunction to stop a representative from soliciting customers from their old firm. In *Salomon Smith Barney, Inc. v. Barcomb*,[35] the court cited two additional NASD arbitration panel decisions where an injunction was refused to stop a representative's solicitation.

Moreover, even when brokerage firms obtain court-ordered injunctions, FINRA arbitration panels frequently dissolve them. In *Merrill Lynch v. Arno*,[36] arbitrators dissolved a preliminary injunction and held that the broker could retain and use client records and accept business from his clients.

### C. THE PROPOSED TRO SEEKS RELIEF THAT DIRECTLY CONFLICTS WITH FINRA RULES 11870 AND IM-2210-7.

Fidelity is seeks to restrict customers' rights to select the broker of their choice by enjoining Clemens from contacting her former Fidelity customers. In doing so, Fidelity ignores

---

[32] *See* FINRA Rule IM 2110-7, attached as **Ex. 8**.

[33] *Prudential Securities, Inc. v. Carey*, No. 4-96-73 (D. Minn. Feb. 13, 1996), attached as **Ex. 9**.

[34] 163 F.Supp. 2d 1371, 1380 (N.D. Ga. 2001).

[35] No. 025484BLS, 2002 WL 31957010 (Mass. Dec. 10, 2002), attached as **Ex. 10**.

[36] NASD Case No. 95-00176 (Feb. 27, 1995), attached as **Ex. 11**.

FINRA Rules 11870 and IM-2210-7, which make it clear that clients must have free access to registered representatives of their choice.[37]

The present action also contradicts the spirit of recent case law, which favors open competition and customer choice. For instance, in *H & R Block Financial Advisors, Inc. v. Majkowski*, the court noted that "[i]n recent years, the securities industry has come to grips with the serious public policy problems presented by its very restrictive employment contracts." 410 F.Supp. 2d 1 (D.D.C. 2006). The court then denied an injunction to enforce a one-year non-solicitation agreement like the one at hand in part because the injunction would have been contrary to the public interest. The court stated:

> The NASD materials referred to earlier [now FINRA Rules 11870 and 2110-7] lay out what I believe to be the correct version of the public interest, which is indifferent to whether H & R Block or SunTrust is more successful in the marketplace and which is focused on the needs of the investing public. If the public interest has any weight in the calculations presented by this case, ***it weighs on the side of open competition and vigorous solicitations***….

*Id*. at 2 (emphasis added).

FINRA panels have also recognized the recent shift in favor of open competition and freedom of choice. In *Salomon Smith Barney, Inc. v. Barcomb*, the court denied an injunction, in part, because of NASD arbitration decision in *Merrill Lynch v. Stark*, NASD Case No. 02-05187 on September 19, 2002. (*See* **Ex. 10**). There, the arbitration panel denied a request for an injunction based on the rights of customers, stating:

> Customer rights are of primary importance and [the panel] is concerned customers are, or may be, subject to harm due to this dispute. The fiduciary duties owed by the parties to the customers are superior to any duties owed by employees to the former employer. The customers have a paramount right to be advised of the move by their broker, and this right includes receiving personal

---

[37] *See* FINRA Rule IM-2210-7 and 11870, attached as **Exs. 9** and **12**.

> contact from their broker. The customers have the right to be
> informed that they decide whether to remain with Merrill Lynch or
> transfer their account. Customer names and addresses and
> telephone numbers are not confidential.

*Id.* at *2.

Injunctive relief conflicts with the FINRA rules governing account transfers, which illustrate that securities regulators recognize the customer's right to choose is paramount. Fidelity's Motion seeks relief directly contrary to FINRA Rules 11870 and IM-2210-7 in that it would prevent Clemens and her new firm from accepting customers' transfers of their accounts. In *Credit Suisse First Boston Corp. v. Grunwald*, the Ninth Circuit Court of Appeals discussed the issue of preemption of state law by NASD rules in specifically holding that "the NASD arbitration procedures in dispute here have preemptive force over conflicting state law":

> If a state law prevents the NASD from complying with its rules or
> if it interferes with the Congressional goals underlying the
> Exchange Act, the state law is preempted by federal law.
> Preemption occurs "where it is impossible for a private party to
> comply with both state and federal law." Additionally, state law is
> preempted if it "stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress."

400 F. 3d 1119, 1132-33 (9th Cir. 2005) (internal citations omitted). The duty Clemens owes to her customers rises above the duty he owed to Fidelity. *Barcomb*, 2002 WL 31957010. Preventing Clemens from contacting any of her former clients makes it impossible for her to comply with FINRA's rules, and certainly prevents Clemens from accomplishing and executing the full purposes and objectives of FINRA's rules - namely making sure her customers are made aware of her status so they can choose for themselves whether to move their account to Clemens' new firm. As such, federal law preempts the actions taken by Fidelity and the TRO request should be denied.

Further, Fidelity's efforts violate just and equitable trade principles under FINRA: "[FINRA] determined that [it] is not consistent with just and equitable principles of trade for a firm to take any action that interferes, delays or impedes a customer's right to transfer his or her account.[38]  Finally, then NASD's CEO and President, Robert Glauber, has said, "[i]t is a fundamental right of an investor to choose with whom he or she does business, and the fact that a broker changes firms should not affect an investor's ability to continue to access his or her account and to do business with that broker."[39]

### D.    FIDELITY WILL NOT SUFFER IRREPARABLE INJURY.

In order to have established the need for a TRO, Fidelity must prove irreparable injury by showing it is under a substantial threat of harm which cannot be remedied through calculable money damages.  *See Interox. Am. v. PPG Indus., Inc.,* 736 F.2d 194, 202 (5th Cir. 1984). Fidelity cannot show it has suffered or will suffer any loss that cannot be remedied by a monetary award.

This lawsuit is not designed to prevent irreparable harm.  Rather, its purpose is to scare brokers into staying at Fidelity.  An "in terrorem" purpose is not a legitimate business purpose for a restriction on competition or communication.  Registered Representative magazine severely criticized firms like Fidelity that rush into court to obtain TRO/Preliminary Injunctions any time a broker leaves.[40]

---

[38] *NASD Adopts New Interpretation Regarding Transfer of Customer Accounts*, NASD Regulation News Release, December 26, 2001, attached as **Ex. 13**.

[39] *Id*.

[40] Nicole Olmstead Coulter, *Sob Story*, Registered Representative, Jan. 1, 1998, attached as **Ex. 14**.

Case 2:13-cv-00239-JRG-DHI   Document 22   Filed 09/22/13   Page 20 of 27   PageID #: 451

Fidelity is attempting to use the Court's authority to extract purely financial settlements from Clemens and perhaps her new employer, Wells Fargo Advisors. Notwithstanding the rush to litigation, brokerage firms virtually always settle their cases against departed brokers because they know the odds of obtaining injunctive relief from an industry arbitration panel are poor. One writer called the settlement practice "extortion." It is common knowledge in the industry, however, that such cases typically settle for between 10% and 25% of the "trailing 12." Thus, despite Fidelity's loud protestations about irreparable harm and the alleged taking of highly confidential records, the plain truth is that some amount of money would "buy out" these contracts and take care of the "problem." Fidelity cannot show it would suffer any loss without injunctive relief. Any alleged damage can be remedied adequately by monetary damages.[41]

Fidelity's harm, if any, can be redressed by monetary damages. In a similar situation, a brokerage house sought a temporary restraining order against its former employee for allegedly violating a non-solicitation agreement when the former employee left to work for a competitor and began soliciting his former clients. *Merrill Lynch v. de Liniere*, 572 F.Supp. 246, 247 (N.D. Ga. 1983). The court denied the broker-dealer's request for relief, holding:

> Merrill Lynch has argued that if Mr. de Liniere succeeds in pirating established customers away from Merrill Lynch, that loss of business will irreparably harm Merrill Lynch. ***The Court finds that any loss of business to Merrill Lynch may be adequately redressed with money damages for breach of contract***. The only possibly irreparable result would be some vaguely defined loss of business momentum, but the Court finds that to be unrealistic in the securities field. The real loss is in commission revenue generated by Mr. de Liniere from former Merrill Lynch customers, and that can be readily calculated from the commissions he and his new firm derive from the old Merrill Lynch customers. As a

---

[41] Indeed, in no other industry are businesses more readily equipped to calculate the monetary value of lost clients. In the securities industry, the amount of commissions generated by each client is reported daily to the firm, the branch manager, and the broker. ***A broker's "trailing 12" information is available at the touch of a button***.

result, there will be no injury to the movant that cannot be remedied later.

*Id*. at 248-49 (emphasis added).

Other courts have recognized that this kind of dispute is not appropriate for injunctive relief because every transfer is documented, and every dollar earned in fees from those customers can therefore be accounted for.[42]  While Fidelity may lose business as a result of Clemens' departure, any resulting losses and damages are easily ascertainable.  The bottom line here is that this dispute is about money and money damages.  Consequently, Fidelity cannot show irreparable injury and the Court should deny Fidelity's motion for TRO.

### E.    THE HARM TO CLEMENS AND THE PUBLIC INTEREST OUTWEIGHS ANY THREATENED INJURY TO FIDELITY.

In these circumstances, courts have held that the harm an injunction would do to an individual, like Clemens, outweighs the threatened injury to the former employer.  In *de Liniere* (above), a broker like Fidelity was denied a temporary restraining order against its former employee, because, *inter alia*:

> If an injunction is granted, Mr. de Liniere may be prevented from serving the customers for whom he has worked over the last two years.  It would leave him with no client base in a business that thrives on commissions from regular clients.  If an injunction were to issue, damage to Mr. de Liniere while he waited ultimately to prevail would be catastrophic as a result of the loss of most of his income.  Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strength of a large brokerage firm and an individual broker, bear far more heavily on Mr. de Liniere than on Merrill Lynch, that disparity of effect supports denial of an injunction.

---

[42] *See Merrill Lynch v. Brennan,* No. 1:07CV475, 2007 WL 632904, at *2 (N.D. Ohio Feb. 23, 2007); *Merrill Lynch v. Callahan,* 265 F.Supp. 2d 440, 444 (D. Ver. 2003); *Morgan Stanley DW, Inc. v. Frisby*, 163 F.Supp. 2d 1371, 1376 (N.D. Ga. 2001); *Barcomb*, 2002 WL 31957010; *Merrill Lynch v. Bennert*, 980 F.Supp. 73, 75 (D. Me. 1997).

*de Liniere*, 572 F.Supp. at 249. In *Prudential Securities, Inc. v. Plunkett*,[43] the court denied an injunction because the former broker was a "new broker with little bargaining power" when he signed the agreement, and an injunction would impair the broker's ability to earn a living.[44] Fidelity is a large investment firm, and the loss of income as a result of Clemens and her customers' departure is insignificant to its financial wellbeing. On the other hand, Clemens lives on the commissions he derives from performing transactions for her clients. In turn, a reduction in her commission resulting from an inability to contact former Fidelity customers for whom he is the registered representative would be much more devastating to her financial wellbeing.

The public interest has been or will be disserved if the TRO is issued, it has been recognized in many cases that stockbrokers stand in a different relationship vis-à-vis their customers than other types of sales-related positions. Specifically, the broker performs an important fiduciary duty in protecting the financial welfare of her clients, and as such, often has a close relationship with her clients. *de Liniere*, 572 F.Supp. at 249. Given the trust involved in this relationship, the public's ability to select the professional service provider of its choice is of paramount importance. Moreover, the right of the customer to be informed and to freely decide whether to move his accounts is also an important public interest. *See Barcomb*, 2002 WL 31957010. The public has little interest in having its choice of brokers restricted to those of one firm. Customers are trying to protect and enhance their own financial welfare. Forcing customers who may have to make quick financial decisions to deal with Fidelity brokers who are not knowledgeable about their accounts, their wants, needs and backgrounds puts the customers' interest at risk. The court in *de Liniere* expressed this public consideration well, stating:

---

[43] 8 F.Supp. 2d 514, 519-20 (E.D. Va. 1991).

[44] *See also Merrill Lynch v. McCullen* (No. 95-14329) and *Merrill Lynch v. Hiddleton* (4/24/90), both attached as **Ex. 15**.

> The Court notes that Merrill Lynch itself has stressed the personal relationship between customer and broker. A stockbroker stands in a different relationship to his customers from that of other kinds of salesman, and fiduciary duties of a broker are recognized in law because of the important role of the broker in protecting the financial welfare of his clients. The "***public's ability to choose the professional services it prefers***," *Singer*, 250 Ga. at 377, 297 S.E.2d at 473, ***is central to the consideration of this criterion of injunctive relief***. The public has a greater interest in being able to choose whether to follow its broker to a new firm or to remain at the old firm with a new broker. This is as important, if not more so, in this case with a stockbroker than it was in *Singer* with an accountant. The public has little interest in having its choice restricted to brokers other than the one who has served them, pending the resolution of this dispute.

*de Liniere*, 572 F.Supp. at 249 (emph. added).

As discussed above, in *H & R Block Financial Advisors, Inc. v. Majkowski*, the court denied an injunction to enforce a one-year non-solicitation agreement like the one at hand in part because the injunction would have been contrary to the public interest. 401 F.Supp. 2d 1 (D.D.C. 2006). Many of Clemens' clients were developed through her own personal relationships and individual efforts, and thus the clients will likely transfer their accounts to Clemens' new broker-dealer. Accordingly, the public interest will not be served through the entry of a TRO. "The 'public's ability to choose the professional it prefers…is central to the consideration of this criterion of injunctive relief.'" *de Liniere*, 572 F. Supp. at 249; *see also Prudential Sec.*, 8 F.Supp. 2d at 519. Neither Clemens nor her customers should be made to suffer.

Further, the TRO would effectively put Clemens' customers' accounts in limbo. This predicament would leave investors exposed to market fluctuations, especially in the current volatile economy and without the ability to react. This is clearly an untenable situation which cuts directly against the public's interest.

## III. THIS COURT SHOULD DENY FIDELITY'S MOTION FOR TRO BECAUSE THIS MATTER IS SUBJECT TO MANDATORY ARBITRATION.

This case should not burden this Court. Fidelity is required under FINRA rules to arbitrate this dispute.[45] Courts have recognized "there is no reason to encourage running into court for preliminary relief when there exists, and indeed in this case there is already set up, a mechanism which can grant the identical relief that [the plaintiff] seeks here."[46] Many courts have denied similar motions for injunctive relief brought by other brokerage firms because the FINRA forum provides adequate legal remedy.[47] Here, Fidelity cannot show irreparable harm because arbitration can and will provide Fidelity with an adequate remedy.[48] Further, Clemens' Agreement with Fidelity clearly contemplated arbitration and shows that the parties intended to arbitrate any disputes between them.[49] The Court should not interfere with the parties' contractual agreement to have its dispute decided by an arbitrator.

---

[45] FINRA Rule IM-13000, attached as **Ex. 16**.

[46] *Merrill Lynch v. McCune*, No. 99-433-A (E.D. Va. March 30, 1999) (included in collective **Ex. 17**).

[47] **Ex. 7**.

[48] *See Merrill Lynch v. Sheehan*, No. 93-99 (N.J. Sup. Ct. July 2, 1999); *Merrill Lynch v. Marum*, No. 99-8509 (S.D. Fla. July 10, 1999); *Merrill Lynch v. Maniscalco*, No. 98-C-8185 (N.D. Ill. Dec. 22, 1998); *Merrill Lynch v. VanderWoude*, No. 1:96-CV-48 (W.D. Mich. Jan. 25, 1996); *Merrill Lynch v. Stockum*, No. 3:96-CV-0059-D (N.D. Tex. Jan. 11, 1996); *Merrill Lynch v. Danforth*, No. 00-4013-B (Sup. Ct. Mass. Sep. 6, 2000); *Merrill Lynch v. Levy*, No. I-1999-9374 (N.Y. Sup Ct. Nov. 29, 1999); *Merrill Lynch v. Lavigne*, No. 339 CV 1966 (D. Ct. Oct. 6, 1999); *Merrill Lynch v. Hulett*, No. 99-3476 (Mass. July 23, 1999); *Merrill Lynch v. McCune*, No. 99-433-a (E.D. Va. Mar. 30, 1999); *Merrill Lynch v. Bush*, 99-1010 (C.D. Ill. Jan. 13, 1999); *Merrill Lynch v. McCullen*, No. 95-14329 (S.D. Fla. Dec. 13, 1995); *Merrill Lynch v. Homanson*, No. 95-1999 (Mass. Mar. 11, 1995); *Merrill Lynch v. Emanuelson*, No. 95-CP-07-544 (S.C. Ct. Comm. Pleas Apr. 11, 1994); *Merrill Lynch v. Hiddleton* (N.Y. Sup Ct. Apr. 25, 1990), attached collectively as **Ex. 17**.

[49] *See* Employee Agreement, attached as Ex. 2 to the Complaint, at ¶ 10.

## CONCLUSION

Based on the foregoing, Clemens requests that this Court deny Fidelity's Motion for Temporary Restraining Order and Permanent Injunction.

Respectfully submitted,

*/s/ Thomas K. Potter, III*

Thomas K. Potter, III (#024857)
John Paul Nefflen (#020226)
BURR & FORMAN LLP
700 Two American Center
3102 West End Avenue
Nashville, Tennessee  37203
Telephone: (615) 724-3200
Facsimile: (615) 724-3331
E-mail: tpotter@burr.com
E-mail: jnefflen@burr.com

*Attorneys for Defendant Melissa Clemens*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document has been served

by electronic means via the Court's electronic filing system on September 22, 2013, on

Matthew J. Evans
Daniel C. Headrick
PAINE, TAWARTER, AND BICKERS, LLP
900 South Gay Street, Suite 2200
Knoxville, TN  37902-1821

Russell Beck
Stephen Riden
BECK REED RIDEN, LLP
155 Federal Street, Suite 1302
Boston, Massachusetts  02110

Stacy N. Schmidt
FMR LLC
32 Devonshire Street, F6B
Boston, Massachusetts  02109

*/s/ Thomas K. Potter, III*