**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

| | | |
|---|---|---|
| **FIDELITY BROKERAGE SERVICES LLC,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO: 2:13-CV-239** |
| | ) | |
| **MELISSA CLEMENS,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and Order Compelling Arbitration, [Doc. 5]. The defendant has responded in opposition, [Doc. 22], and the Court heard oral argument on September 23, 2013. For the reasons set forth below, the motion will be GRANTED IN PART and DENIED IN PART.

**I.      Facts**

Melissa Clemens ("Clemens" or "defendant") abruptly resigned her position as an account executive at the Johnson City investor center of Fidelity Brokerage Services LLC ("Fidelity" or "plaintiff") without notice on September 6, 2013. Fidelity provides investment services to customers, the vast majority of which are high-net-worth customers who have a minimum of $250,000 or above in invested assets at Fidelity. Account executives are assigned by Fidelity to manage Fidelity's relationship with these customers. In order for Clemens to service these accounts, she had access to customers' confidential personal and financial information for at least 424 households, representing in excess of $466 million in assets under

Fidelity management. Clemens was assigned approximately half the assets under management of the premium service group at the Johnson City investor center.

At the beginning of her employment on April 13, 2001, and then again on July 30, 2010, Clemens signed an Employee Agreement [the "Agreement"] as a condition of her employment with Fidelity. The Agreement "describes certain aspects of [her] employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory and other obligations." [Doc. 5-1 at 13]. "Confidential information" is defined under the Agreement as "all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public" at the time disclosed to Clemens and includes, among other things, "customer, prospect, vendor, and personnel lists." [*Id*.]. In the Agreement, Clemens agrees that confidential information, as defined in the Agreement, was "imparted to [her] in a relationship of confidence" and that during her employment and thereafter, she will not "copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any confidential information" except as necessary to carry out her job responsibilities. [*Id*.]. Important to this case, the Agreement contains a "non-solicitation" provision as follows:

> 6. *Non-solicitation*. During my employment and for a period of one year following my separation from employment by the Fidelity Companies, I will not directly or indirectly, on my own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. For this same period, I also will not directly or indirectly, on my own behalf or on behalf of anyone else or any company, sell any security, insurance or annuity product or any other product or service to any customer or prospective customer with whom I had personal contact during the course of my employment by the Fidelity Companies. During this same period, I also will not directly or indirectly, on my own

behalf or on behalf of anyone or any company, hire, solicit in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies to leave his/her employment.

[*Id*. at 13-14]. The Agreement also provides that it shall be "governed in accordance with Massachusetts law." [*Id*. at 14].

Since Clemens' abrupt resignation on September 6, 2013, the branch office manager of the Johnson City Investment Center has "begun to receive reports that immediately after Clemens resigned from Fidelity and began working for a competitor, she was contacting Fidelity customers to solicit their business." [Doc. 5-1, Decl. Of Jonathan Bell, ¶ 12]. Bell's investigation revealed the following contacts between Clemens and Fidelity customers:

- On Monday, September 9, 2013, an unknown customer called the Johnson City branch office and spoke with the account executive who has taken over most of Clemens' customers and asked for Clemens' cell phone number. The customer said that Clemens had called him over the weekend and they had scheduled a meeting for Monday. The customer indicated that he knew Clemens no longer worked at Fidelity.

- On Monday, September 9, 2013, an identified Fidelity customer came into the branch office and reported that Clemens had called his home on Saturday.

- Also on Monday, September 9, 2013, another identified Fidelity customer reported that Clemens had called him on Saturday night.

- On September 9, 2013, a Fidelity employee reported that he had spoken with Clemens' husband who informed him that "Clemens hoped to take at least 20 of her Fidelity customers with her to Wells Fargo."

- On September 9, 2013, Clemens called Fidelity with a Fidelity customer on the phone with her who wanted to liquidate both of her accounts in the amount of $605,393 and transfer them to Wells Fargo.

- On September 13, 2013, Clemens called Fidelity with Fidelity customers on the phone with her. The customers wanted

3

to liquidate their account and transfer assets in the amount of $993,445 to Wells Fargo.

● On September 19, 2013, Clemens called Fidelity with Fidelity customers on the phone with her. The customers wanted to liquidate both of their accounts and transfer $636,064 invested with Fidelity to Wells Fargo.

● On September 20, 2013, Clemens called Fidelity with Fidelity customers on the phone with her. The customers wanted to liquidate their accounts at Fidelity in the amount of $302,364 and transfer them to Wells Fargo.

[Doc. 5-1, Decl. of Bell, ¶¶ 13-18; Doc. 30, Supp. Decl. of Bell, ¶¶ 2-3]. As of September 23, 2013, seven Fidelity customers have transferred their money to Clemens at Wells Fargo, and three of these customers first established their accounts with Fidelity prior to Clemens' employment with Fidelity. [Doc. 30, ¶ 5].

Clemens acknowledges calling former customers to announce her new affiliation with Wells Fargo and to provide contact information. She asserts, however, that she has not solicited any customers to move their accounts to Wells Fargo but "[i]f clients asked [her] questions about [Wells Fargo], [she] answered them." [Doc. 22-2, Decl. of Clemens, ¶ 9]. Clemens states that Wells Fargo made it clear to her that she was not to use in her employment with Wells Fargo any of Fidelity's confidential information or solicit Fidelity's customers. Wells Fargo instructed her that she could contact Fidelity customers whose names she could recall and whose telephone numbers she could obtain from public sources, and then only to announce her departure from Fidelity, that she had moved to Wells Fargo, and provide her new contact information. According to Clemens, she followed Wells Fargo's instruction. [*Id.* at ¶ 7]. At the time of her resignation on September 6, 2013, Clemens took only her personal possessions and did not take anything belonging to Fidelity. [*Id.* at ¶ 5].

According to Fidelity, it does not have its account executives make "cold calls" to persons who have no existing relationship with Fidelity or who were not referred to Fidelity. Instead, Fidelity requires its account executives to develop service relationships based on leads that Fidelity provides from two primary sources. First, Fidelity provides information to its account executives from prospective customers who initiate contact with Fidelity or, second, regarding customers with whom Fidelity already has a relationship when these customers experience certain "triggering events," such as Fidelity 401(K) distributable events. In addition, account executives may be assigned to service customers previously serviced by other account executives who leave Fidelity or are promoted to another position. [Doc. 5-2 at ¶¶ 3-5]. Clemens apparently does not dispute Fidelity's assertions but does claim that from approximately April, 2011 through approximately April, 2013, her client base at Fidelity was "closed book," meaning Fidelity did not provide leads or new customers. According to Clemens, during that time she prospected for new customers by her own efforts through civic organizations, church, acquaintances, family, friends, and cold calls. [Doc. 22-2 at ¶ 2].

Fidelity maintains customer "look-up" reports in its customer information program known as "OneView." Fidelity also requires account executives to note their customer interactions on Fidelity's customer interaction software known as "Siebel." When a customer calls Fidelity, the account executive can look up extensive information about the customer in OneView and is required to enter information concerning a customer interaction, including the date, time and substance of the discussion, in the "notes section of Siebel." [Doc. 5-1 at ¶ 19]. Bell, the branch manager, reviewed Clemens' "look-ups" for her last day. On her last day, September 6, 2013, Clemens had looked up information on seven customers but had made a corresponding Siebel note only as to one. Nothing in the notes indicates that she had any

5

interaction on that date with the other six. [*Id*. at ¶ 20]. The Siebel notes also indicate that immediately before her resignation, Clemens placed a call to a Fidelity customer responsible for a major corporate account which was worth approximately $5 billion in assets. [*Id*. at ¶ 21].

Clemens asserts that "[t]here is nothing suspicious or unusual" about her look-ups or Siebel notes, noting that Fidelity required a Siebel note for customer contact, not every look-up. She does not otherwise explain her look-ups on the last day of her employment. Clemens does acknowledge contact with the corporate customer referred to above, asserting, however, that she only returned the customer's call and left a message to set up a phone appointment "to discuss his concerns." Clemens has not called or met with that customer since her resignation. [Doc. 22-2 at ¶ 4].

On June 26, 2013, more than two months before her resignation from Fidelity, Clemens signed a document provided by Wells Fargo entitled "Financial Advisor Account Transition Guidelines." [Doc. 22-2 at 5-8]. These guidelines set forth the manner in which Wells Fargo "expects all financial advisors hired from other firms to make their transition" to Wells Fargo. [*Id*. at 5]. Between the signing of the guidelines on June 26, 2013 and Clemens' resignation from Fidelity on September 6, 2013, Fidelity's record of "look-ups" indicate that Clemens accessed customer information 1,097 times. [Doc. 30 at ¶ 8].

## II.    Preliminary Injunction Standard

When deciding a motion for a preliminary injunction, the Court considers and balances four factors: (1) whether the plaintiff has a strong likelihood of success on the merits; (2) whether, without the injunction, the plaintiff will suffer irreparable harm; (3) whether issuance of the injunction will cause substantial harm to the defendant or others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. *Tennessee Scrap Recyclers*

*Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009); *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 347 (6th Cir. 1998). These factors are not prerequisites to the issuance of an injunction but are factors to be balanced in considering whether to grant the injunction. *Coalition To Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006). Generally, the purpose of a preliminary injunction is to preserve the status quo. *Smith Wholesale Co., Inc. v R. J. Reynolds. Tobacco*, 477 F.3d 854, 873 n.13 (6th Cir. 2007) (quoting *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)).

A preliminary injunction is an extraordinary remedy and an exercise of the Court's equitable authority. *Salazar v. Buono*, 559 U.S. 700, 714 (2010); *Winter v. Natural Resources Defense Counsel*, 555 U.S. 7, 24 (2008). Equitable relief is not granted as a matter of course, and a court should be cautious when contemplating such relief. *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982). The party seeking a preliminary injunction must "demonstrate a clear entitlement to the injunction under the given circumstances. *Entertainment Productions, Inc. v. Shelby County*, 545 F.Supp.2d 734, 740 (W.D. Tenn. 2008). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

## III.    Analysis and Discussion

Before turning to the factors which must be considered and balanced, there is one preliminary matter which must be addressed. Clemens asserts, without further elaboration or citation to relevant case law, that "Fidelity's case rests only [on] inadmissible hearsay, double-hearsay and speculation drawn from that inadmissible evidence." [Doc. 22 at 2]. The Sixth

7

Circuit does not appear to have explicitly addressed the question of whether such potentially inadmissible evidence may be considered in the context of a preliminary injunction hearing. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 n.4 (6th Cir. 1985) ("The parties assume that the Federal Rules of Evidence are fully applicable to a hearing on a motion for a summary judgment. We express no opinion on this question. *But see* 11 C. Wright & A. Miller, *Federal Practice And Procedure* § 2949 (1973) (affidavits may be used to support preliminary injunction; 'trial court should be allowed to give even inadmissible evidence some weight.')").

Generally speaking, district courts within this circuit have not required stringent adherence to rules of evidence when reviewing petitions for injunctive relief and have considered such evidence. *See Damon's Restaurants, Inc. v. Eileen K, Inc.*, 461 F.Supp.2d 607, 620 (S.D. Ohio, 2006) (collecting cases from this and other circuits). *See also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."); *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures less formal and evidence that is less complete than in a trial on the merits.").

Both parties in this case elected to proceed on the basis of affidavits and the Court will consider those affidavits and their contents, especially since defendant does not specifically identify the allegedly offending portions of the affidavits or consider and discuss whether the statements might be admissible for a proper purpose.

### A. Likelihood of Success on the Merits

"To obtain a preliminary injunction, a plaintiff must demonstrate, among other things, a strong or substantial likelihood or probability of success on the merits." *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992). This factor is usually satisfied if the moving

party has "raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *In re DeLorean*, 755 F.2d at 1229. In balancing the four factors, "[t]he moving party must show a strong likelihood of success on the merits if all other factors militate against granting a preliminary injunction. Similarly, the moving party need show less likelihood of success on the merits if the other factors indicate that the Court should issue a preliminary injunction." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1385 (6th Cir. 1995) (citations omitted).

Fidelity asserts three claims for relief against Clemens here. First, Fidelity alleges a violation of Tennessee Code Annotated § 47-25-1702 and common law for actual and threatened misappropriation of trade secrets. Second, Fidelity alleges breach of contract, *i.e.*, Clemens' employment agreement. Finally, Fidelity claims that Clemens' solicitation of Fidelity customers in violation of the employment agreement constitutes unfair competition/trade practices. The parties agree that this dispute is ultimately subject to arbitration under the rules of the Financial Industry Regulatory Authority ("FINRA"). Under FINRA's arbitration procedure, Fidelity's already filed statement of claim will proceed in a standard-track arbitration before FINRA, a procedure which typically takes a year or more to complete; however, if the court issues an injunction, FINRA will schedule an expedited arbitration to take place within fifteen (15) days of the entry of the injunction.

Clemens argues that Fidelity cannot succeed on the merits in this case. First, Clemens argues that her employment agreement with Fidelity is *per se* unreasonable and not enforceable because of "Fidelity's grossly overbroad no-contact interpretation." [Doc. 22 at 5]. A federal district court sitting in diversity applies the choice of law rules of the forum state. *Cole v. Mileti*,

9

133 F.3d 433, 437 (6th Cir.), *cert. denied*, 525 U.S. 810 (1998).  Tennessee choice of law rules

therefore apply.  Under Tennessee law, the validity of a contract and the substantive rights of the

parties to the contract are governed by the law of the state contemplated by the parties.

*Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir. 1977).  "Tennessee follows the

rule of l*ex loci contractus.*"  *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct.

App. 1999) (citing *Ohio Casualty Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn.

1973)).  If the parties intend to apply the law of another jurisdiction, Tennessee courts will

generally defer to the agreement, *Vantage Technology*, 17 S.W.3d at 650, as long as the choice

of law provision was executed in good faith, bears a material connection to the transaction, is

reasonable and not a sham or subterfuge, and is not "contrary to a fundamental policy of a state

having a materially greater interest and whose law would otherwise govern."  *Id.* (citing

*Goodwin Brothers Leasing, Inc. v. H & B, Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980)).

As set forth above, the employment agreement provides that it will be governed by

Massachusetts law.  Thus, the parties' agreement to apply the law of Massachusetts will be

followed unless one of the factors above exists.  Clemens argues that "Tennessee has a long-

standing and strong fundamental policy against non-competition and non-solicitation

agreements." [Doc. 22 at 3].  Clemens does not, however, cite any persuasive authority for such

a broad and sweeping conclusion.  Rather, as Fidelity argues, it appears that Tennessee and

Massachusetts law with respect to restrictive covenants is similar, if not identical.  Both states

enforce such agreements if they are reasonably limited in duration and geographic reach to the

extent necessary to protect a legitimate business interest.  Compare *Vantage Technology*, 17

S.W.3d at 644 with *Oxford Global Resources, Inc.. v. Guerriero*, 2003 WL 23112398 (D. Mass.

2003) (citing *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 716, 175 N.E.2d 374 (1961)).

*See also Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn. 1984) (citing with approval *All Stainless, Inc. v. Colby*, 364 Mass. 773, 308 N.E.2d 481, 486 (1974)). The Court, therefore, will interchangeably apply Massachusetts and/or Tennessee law in determining the validity of the employment agreement.

Under Massachusetts law, the Court must "consider if the covenant (1) is necessary to protect the legitimate business interests of the employer, (2) supported by consideration, (3) is reasonably limited in all circumstances, including time and space, and (4) is otherwise consonant with public policy." *IKON Office Solutions, Inc. v. Belanger*, 59 F.Supp.2d 125, 128 (D. Mass. 1999). Clemens claims the employment agreement is unenforceable for three reasons: (1) it protects Fidelity from ordinary competition rather than legitimate business interests; (2) Clemens learned the customer names through the course of her employment by her own efforts and relationships; and (3) the argument has no territorial limitations. The Court will address each briefly.

Clemens acknowledges that Tennessee recognizes that trade secrets and confidential information are legitimate business interests that may be protected through a non-solicitation agreement. She argues, however, that Fidelity's "grossly-overbroad no-contact interpretation" renders the agreement unreasonable and unenforceable because Fidelity is "attempting to assert an illegitimate business interest in customer contact information," *i.e.*, "customary competition in the brokerage business." Clemens' interpretation of Fidelity's injunctive request, however, is misplaced. Fidelity does not seek a no-contact order but rather seeks an injunction prohibiting Clemens from "soliciting any business from any customer or prospective customer" served by her or whose name became known to her through her employment at Fidelity. Clemens further argues that customers' names, addresses and phone numbers are not confidential information

under Tennessee law, citing *B & L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 214 (Tenn. Ct. App. 2004).

While restrictive "covenants not to compete are disfavored in Tennessee," they will be enforced, as noted above, if "deemed reasonable under the particular circumstances." *Columbus Medical Servs., LLC v. Thomas*, 2009 WL 2462428 at *14 (Tenn. Ct. App. August 13, 2009) (quoting *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (Tenn. 1966)). Because covenants not to compete are in restraint of trade, however, they are construed strictly against the employer. *Hasty*, 671 S.W.2d at 472. Several factors are relevant in determining whether a covenant not to compete is reasonable including "the consideration supporting the agreement[ ]; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest." *Allright*, 409 S.W.2d at 363.

The first of these factors is not an issue here. In balancing the other three factors, the threshold question is whether the employer has a legitimate business interest, *i.e.*, one that is properly protectable by a non-competition covenant. *Hasty*, 671 S.W.2d at 473. A properly protectable interest must be found in the existence of special facts over and above ordinary competition, because an employer may not restrain ordinary competition. *Id*. These facts must establish that without the covenant the employee could gain an unfair advantage in future competition with the employer. *Id*. Considerations in determining whether an employee would gain an unfair advantage include (1) Whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the

customers on behalf of the employer.  *Id.*  These considerations may operate individually or in tandem to give rise to a properly protectable business interest.  *See, e.g., AmeriGas Propane, Inc. v. Crook*, 844 F.Supp. 379 (M.D. Tenn. 1993).

An employer does not have a protectable interest in the general knowledge and skill of an employee.  *Hasty*, 671 S.W.2d at 473.  This is true even if the employee obtained such general knowledge and skill through expensive training.  *Id.* ("[G]eneral knowledge and skill appertain exclusively to the employee, even if acquired with expensive training and thus does not constitute a protectible interest of the employer").  An employer may have a protectable interest, however, in unique knowledge and skill that an employee receives through special training by his employer.  *Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984) ("A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business.").

An employer also has a legitimate business interest in keeping its former employees from using the former employer's trade or business secrets or other confidential information in competition against the former employer.  *Hasty*, 671 S.W.2d at 473.  A trade secret is defined as any secret "formula, process, pattern, device or compilation of information that is used in one's business and which give him an opportunity to obtain an advantage over competitors who do not use it."  *Hickory Specialties, Inc. v. B & L Laboratories, Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979) (quoting *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g. Corp.*, 255 F.Supp. 645 (E.D. Mich. 1996)).  "Confidential information" is generally analogous to "trade secret."  The identities of the employer's customers do not generally amount to confidential business information.  *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814 (Tenn. Ct. App.

1990). An employer may, however, also have a legitimate protectable interest in the relationships between its employees and its customers. *See Hasty*, 671 S.W.2d at 473.

To determine whether a trade secret or confidential information was protectable, courts have considered factors such as the measures taken by the business to guard the secrecy of the information, the value of the information, and the ease with which it could be duplicated or acquired by others. Douglas F. Halijan, *The Past, Present, and Future of Trade Secrets Law in Tennessee: A Practitioner's Guide Following the Enactment of the Uniform Trade Secrets Act*, 32 U. Mem. L. Rev. 1, 9 (2001) (citing *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998)). Also important may be the nature of the employee's relationship with the employer's customer. *Hasty*, 671 S.W.2d at 473. It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer. The employee in essence becomes "the face" of the employer. This relationship is based on the employer's goodwill. In this role, the employee is made privy to certain information that is personal, if not technically confidential. Because the relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his or her own benefit. *Jones v. United Propane Gas, Inc.*, 2009 WL 5083476 (Tenn. Ct. App. December 28, 2009) (citing *Vantage Technologies*, 17 S.W.3d at 644-46).

While Clemens correctly notes that customer names, addresses and phone numbers are generally not confidential information, there appears to be more to the issue here. At the time of her abrupt resignation from Fidelity on September 6, 2013, Clemens had worked as an account executive for Fidelity for approximately 12 years. During that time, Clemens had used Fidelity's resources, research, information and office support to advise Fidelity's customers. During that

period of time, she had repeated, regular communications with customers, typically once per month. Fidelity alleges that Clemens in fact became the face of Fidelity to the customers because of the nature of her interaction with those customers during her employment, Clemens has provided services on Fidelity's behalf to many high-net-worth customers and has had access to those customers' confidential, personal and financial information. In addition, Fidelity appears to make significant efforts to keep such information confidential through its confidentiality policy and through employee agreements which its employees are required to sign.

In this Court's view, the "aggregate of the information" which Clemens had access to as a result of her employment with Fidelity may be deemed confidential or a trade secret. *See Hamilton-Ryker Group, LLC v. Keymon*, 2010 WL 323057, at *13 (Tenn. Ct. App. Jan. 28, 2010) (citing *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)). "Moreover, even if the information could have been developed by independent means, 'it may be protectable if the former employee does not develop it by independent [means] but in fact obtains his knowledge . . . from his former employer and then uses this knowledge to compete with the former employer." *Id*. As in the *Hamilton-Ryker* case, the speed with which Clemens utilized this information to begin competing with Fidelity demonstrates its independent economic value. By her own admission, she contacted Fidelity customers immediately to announce her new affiliation and several significant Fidelity clients switched their accounts to Wells Fargo, Clemens' new employer, in less than one week of Clemens' resignation. Clemens also argues that she learned the customer names through the course of her employment by her own efforts and relationships. She apparently refers to the portion of her declaration where she states that "From approximately April 2011 through approximately 2013," her client base was

"closed book" meaning that she prospected for new customers by her own efforts during that period of time among her friends, acquaintances, family and through civic organizations, church and cold-calls. Fidelity, of course, disputes Clemens' assertion. This is a factual dispute the Court need not address in this context. Also in Clemens' declaration, she asserts that over half of the Fidelity customers who have transferred their accounts to her consist of friends, family and acquaintances. Clearly, however, a number of the customers who have transferred their accounts do not fall in that category and are persons with whom Clemens had a preexisting relationship as the agent or representative of Fidelity. Certainly, as to the remaining portion of the customers whose accounts have been transferred, the analysis from the earlier portion of this memorandum applies fully.

Finally, Clemens argues that the employment agreement is unenforceable because of its lack of a territorial limitation. Admittedly, the agreement does not contain a territorial limitation which she argues is "expressly require[d]" in Tennessee. As Clemens later acknowledges in her brief, she misstates Tennessee law. In some cases, a restriction against soliciting the employer's customers can in effect substitute for a geographic limitation by stating the impermissible actions of the employee by other means. *Hamilton-Ryker Group*, 2010 WL 323057 at *12 (citing *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743 (Tenn. Ct. App. 1987)) (finding non-solicitation agreement enforceable despite its omission of a territorial limitation where "employer has a legitimate protectable business interest in its current clients"). Rather than being limited by geographical boundaries, the employment agreement here prohibits Clemens from soliciting a specific group of persons. "[A]s the specificity of limitation regarding the class of person [sic] with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases." *Id.* (quoting *Seach v. Richards, Dieterle & Co.*, 439

N.E.2d 208, 213 (Ind. Ct. App. 1982)). Given this, the lack of a territorial limitation in the employment agreement is not fatal and does not render the employment agreement unenforceable.[1]

On one matter, however, Fidelity has not shown a likelihood of success on the merits. Fidelity seeks, among the other relief sought, an injunction requiring Clemens to return to Fidelity any records, documents, and information pertaining to Fidelity customers or prospective customers. Fidelity admittedly offers no proof that such records, documents or information were removed from Fidelity by Clemens and Clemens specifically denies having removed such material. As a result, Fidelity cannot succeed on the merits with respect to this claim.

## B.    Irreparable Harm

Fidelity argues that irreparable harm exists because of its loss of direct sales as well as customer referrals to other potential customers, citing *AmeriGas,* 844 F.Supp. at 390. "The inability to properly estimate damages weighs in favor of a preliminary injunction." *Id*. Fidelity argues that it is impossible to predict the loss of business, trade secrets and goodwill under the circumstances of this case. Clemens response is that Fidelity cannot show any loss, much less irreparable harm. Clemens refers to Fidelity's purpose here as an "in terrorem" purpose to scare brokers into staying at Fidelity and to extract a financial settlement from Clemens and perhaps her new employer, Wells Fargo. Clemens also argues that any alleged damage can be remedied adequately by monetary damages.

---

[1]    Clemens does make one other argument that the Court should address. Clemens argues that it is "now the standard industry practice that when a registered representative moves from one firm to another, he or she takes with him customer names, addresses and telephone numbers," and that the "leaving representative contacts his or her customers and advises them of the change." [Doc. 22 at 15]. Clemens relies on the "Protocol for Broker Recruiting" in support of her argument. She cites no authority for such a broad proposition and, indeed, no authority exists that the protocol somehow creates an industry standard. The protocol, by its own terms, applies only to those firms which have signed the protocol. It is undisputed that Fidelity has not done so. The protocol has no application to this case. *See Hilliard v. Clark,* 2007 WL 2589956 (W.D. Mich. Aug. 31, 2007).

While the Court agrees that the loss of fees earned from the customers who transfer their accounts can ultimately be calculated and compensated as money damages if Fidelity prevails on the merits, it does appear to the Court that certain elements of Fidelity's claimed damages in the form of loss of customer referrals and loss of goodwill are very difficult to calculate, or even adequately prove. This factor weighs somewhat in Fidelity's favor.

### C. Substantial Harm to the Defendant or Others

Fidelity argues that it is simply attempting to protect its valuable trade secrets, goodwill, business reputation and contract rights and is not attempting to prevent Clemens from working in the industry, competing for new accounts, or accepting business from customers who seek out her services. Fidelity thus argues that any potential harm to Clemens is outweighed by the benefit of the injunctive relief sought. Predictably, Clemens sees the matter differently. She argues that Fidelity is a large investment firm and the loss of income as a result of her customers' departure is insignificant while a corresponding reduction in her commissions would be devastating to her financial well being. The Court tends to agree with Fidelity here also. After all, Clemens had accepted significant compensation from Fidelity for more than a decade and accepted the contractual provisions at issue here as part of the conditions of her employment. Having accepted the benefit of the contract for more than a decade, Clemens' complaints about the effect on her of enforcing the agreement have little force. As Fidelity points out, an injunction will not prevent Clemens from working in the industry, developing new accounts based on her own efforts or accepting business customers who seek her out. In addition, the issuance of an injunction in this case will provide Clemens with a forum where she can obtain a reasonably quick resolution of the dispute where otherwise she would be required to wait for a

year or more for FINRA resolution of Fidelity's statement of claim. This factor also weighs somewhat in Fidelity's favor.

### D. The Public Interest

There are several significant public interests at play here. First, as Clemens argues, there is a strong public interest in favor of the public's ability to select a professional broker to provide sought after services and to be informed and to freely move his or her accounts freely. Prohibiting Clemens from *soliciting* the transfer of their accounts, however, in no way impairs the public's ability to select the professional service provider of its choice, nor does it inhibit any customer, on his or her own initiative, from moving or transferring accounts from Fidelity to another broker or brokerage firm, including Clemens and/or Wells Fargo Advisers.

The public also has a strong interest in favor of upholding contracts. *AmeriGas*, 844 F.Supp. at 390; *FirstEnergy Solutions Corp. v. Flerick*, 2013 WL 1500452, *8 (6th Cir. April 15, 2013) (citation omitted). There is no suggestion here that Clemens was coerced to enter into the employment agreement or that it was somehow forced upon her, except as a condition of her continued employment. Since the non-solicitation covenant does not violate public policy and is not *per se* unreasonable, the public's interest requires that parties be held to their agreements.

Finally, the public also clearly has an important interest in the quick resolution of disputes. As noted above, absent the entry of an injunction in this case, Fidelity and Clemens will likely wait a year or more for FINRA arbitration of the dispute to occur. With the issuance of the injunction, FINRA will proceed with an expedited arbitration hearing, leading to a much quicker resolution of this dispute. That procedure is less costly, preserves limited judicial resources, and serves the interest of both parties and the public.[2]

---

[2] Clemens also argues that, because the matter is subject to FINRA arbitration, there is no reason for preliminary relief and that FINRA "can and will provide Fidelity with an adequate remedy." She further argues that "[t]he Court

## IV. Conclusion

After balancing all the necessary factors, the Court concludes, for the reasons set forth above, that the preliminary injunction requested by the petitioner prohibiting Clemens from using confidential information or soliciting Fidelity's customers should enter. The motion for preliminary injunction, [Doc. 5], is therefore GRANTED IN PART and DENIED IN PART.

Accordingly, it ORDERED that:

A. Effective immediately, Clemens is enjoined from engaging, either directly or indirectly, and whether acting alone or in concert with others, in the following acts until further Order of this Court:

(i) soliciting any business from any customer or prospective customer of Fidelity who she served or whose name became known to her while in the employ of Fidelity;

(ii) using, disclosing, transmitting, and continuing to possess for any purpose, including solicitation of customers, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and financial information of the customers Clemens learned of through her employment with Fidelity;

(iii) making any representation likely to create the erroneous belief that the goods or services of Clemens or her employer, or the goods or services of anyone acting in concert with her, are authorized by, sponsored by, licensed by or in any way associated with Fidelity, or otherwise engaging in any other acts or conduct that would cause customers erroneously to believe that Clemens or her employer's goods or services are somehow sponsored by, authorized by, licensed by, or in any way associated with Fidelity; and

(iv) from hiring, soliciting in any manner, or inducting or attempting to induce any employee of Fidelity to leave his/her employment.

---

should not interfere with the parties' contractual agreement to have its dispute decided by an arbitrator." Clemens argument is lost on the Court. A preliminary injunction in this case will in no way interfere with the ability of the parties to have this dispute decided by an arbitrator. Either way, with or without the injunction, the matter is subject to FINRA arbitration. The only effect of an injunction in this context is that it will allow the parties to obtain a quicker resolution of the dispute.

B.  Pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties will proceed to an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure;

C.  Fidelity must give security in the amount of $50,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, which shall be paid into the Clerk's office for the Eastern District of Tennessee, Greeneville Division and remain there until further order of this Court; and

D.  This Order shall remain in full force and effect pending arbitration on the merits before the FINRA arbitration panel.

Because this matter will proceed to arbitration, it is further ORDERED that further proceedings in this case are STAYED pending the arbitration.  The plaintiff shall file a status report within ninety (90) days of the entry of this order as to the status of the arbitration.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
